# CASES DETERMINED

BY THE

# SUPREME COURT

OF THE

## STATE OF MISSOURI

AT THE

### OCTOBER TERM, 1902.

---

*(Continued from Volume 170.)*

## THE STATE v. MEYSENBURG, Appellant.

### Division Two, December 16, 1902.

1. **Bribery:** INDICTMENT: SUFFICIENCY. An indictment for accepting a bribe that does not name the person or corporation from whom defendant received the gift or bribe, or the nature, amount, or character thereof, is insufficient.

2. ———: ———: AGREEMENT: TO VOTE WITH PARTIALITY: NECESSARY CHARGE. Where the statute makes it bribery in any public officer of the State or of any city or town, to corruptly accept "directly or indirectly, any gift, consideration, gratuity or reward, under an agreement that his vote shall be given in any particular manner or upon any particular side, or more favorable to one side than the other, in any matter or proceeding which may be brought before him in his official capacity, or that he will neglect or omit to perform any official duty or perform the same with partiality or favor," an indictment which attempts to charge that the defendant entered into an agreement with the agent of a railroad company, under which there was paid to him the sum of nine thousand dollars for worthless and unmarketable stock in another company, and that he would *until and unless* said money was paid, "oppose, resist, withstand, thwart and defeat the passage and enactment," by the city council of which he was a member, of a certain measure granting a franchise to said railroad company, is insufficient if it does not allege that the money was received by defendant on an agreement

(1)

State v. Meysenburg.

that he would perform his said official public duty with partiality or favor and otherwise than according to law.

3. ————: ————: THREAT TO OPPOSE LEGISLATION: INFERENCE. A charge that defendant was paid nine thousand dollars under an agreement that until and unless said sum was paid he would oppose, resist, thwart, and defeat the passage of a railway franchise measure, does not plainly charge an agreement for favorable or partial action, but a threat to oppose the bill "until and unless" he was paid. Nor can it be held, except by inference, that it is a charge that defendant was opposing the measure and had agreed in consideration of said $9,000 to cease said opposition, for there is no allegation that defendant had previously opposed the bill. Nor is there any averment that in this agreement he had promised to cease to oppose the bill, nor that he would perform his public duty impartially or otherwise than according to law. The indictment is, therefore, insufficient.

4. ————: ————: ————: STATUTORY CRIME: INFERENCE. Where the crime is statutory it is essential that the indictment should charge with certainty and precision all the facts necessary to constitute the offense, and must conform to the language or state all the facts which bring it within the terms of the statute. And the crime described by the statute must be charged by plain allegations, not by inference merely.

5. ————: ————: USING WORTHLESS STOCK AS SHAM. Where it is desired to show that the transaction by which the councilman turned over to the bribe-giver certain stock in exchange for the money given him, was a sham and a false pretense to cover up the alleged bribe, it is proper that the indictment should charge that the money paid was "the pretended and ostensible price, consideration and value of certain worthless and unmarketable stock." Without a charge that the transfer of the stock was "pretended and ostensible" and a mere cloak for the bribe, the defendant would not be prepared to meet such a claim.

6. ————: GRAVAMEN OF CRIME. The gravamen of the statutory crime of bribery is the acceptance of a bribe under a corrupt agreement. The offense is complete if a city councilman accepted a bribe under an agreement either to cease his opposition to a bill or to support it by his vote, decision or judgment. It is wholly immaterial whether or not he afterwards carried out his agreement.

7. DEFECT IN INDICTMENT: WHEN AVAILABLE. The defect in an indictment may be raised for the first time in the appellate court, although no motion to quash or demurrer was lodged against it in the circuit court.

8. ————: ————: KIND OF MONEY. It is not necessary to allege the value or the kind of money received as a bribe.

State v. Meysenburg.

9. ———: ———: ———: CHECK: VARIANCE.  Where the indictment charges that $9,000 lawful money of the United States was paid defendant, and the proof is that he received a bank check for that amount, there is no such variance as to justify a reversal, in view of the Missouri statute.

10. ———: ———: ———: PROOF OF LESS AMOUNT.  Where the charge is that the defendant received $9,000 as a bribe, it is immaterial that the proof is that he received $33.72 less than $9,000.

11. ———: USING WORTHLESS STOCK AS SHAM: PROOF: VALUE OF STOCK. Under such a charge it is competent for the State to show whether or not the shares of stock constituted the consideration for the money paid, or were a mere pretense and sham, and the testimony of the bribe-giver that he regarded the stock as worthless and valueless is competent evidence on that point, and it was competent for the defendant to show they were valuable.

12. ———: ———: ———: ———: ADVICE OF COUNSEL.  Defendant offered to show by a lawyer whom defendant had consulted about the time the stock was turned over to the bribe-giver in exchange for money, that the stock at least had a litigated value.  *Held*, that this advice of counsel was no defense if defendant proposed to use the stock to extort payment as the price of his ceasing to oppose the passage of a railway franchise bill, but was an offer of a self-serving statement.

13. ———: ———: ———: ———: REAL VALUE.  It is competent to show by competent evidence that such shares of stock, although they had no marketable value, still had a real value, by proof of the value of the assets of the company, or of the dividend-yielding capacity of the stock.

14. ———: ———: ———: ———: COMPROMISE PRICE.  But it is not competent to show what was the value of such stock by showing what some person received therefor on a compromise after threatened litigation.

15. ———: HONESTY OF TRANSACTION: INSTRUCTION: SUBSTANCE COVERED BY OTHERS.  It is for the jury to determine whether the transaction by which the defendant while city assemblyman exchanged certain stocks for money was an honest one or one made in pursuit of an agreement that he would cease to oppose the passage of a bill, and instructions on this point should be given unless their substance were contained in others given.  And in this case, it is held that two instructions, 8 and 11, asked by defendant were improperly refused.

16. ———: ———: ———: SELLING STOCK WHILE ASSEMBLYMEN.  In a prosecution of an assemblyman for receiving a bribe, it was charged that the other party paid him $9,000 for worthless stock.

The other party, after testifying for the State concerning the value of the stock, "No; I do not know anything about it," was permitted to state, "I do not know. I considered them of no value." He also testified that shortly before the transaction with defendant a third party had sold stock in the same company for $10 a share. *Held,* error to refuse instructions that, if defendant owned the stock, he could sell it to the other party, notwithstanding his membership in the assembly, and that if he believed his stock was of the value he received, etc., he was not guilty of any corrupt purpose; the testimony recited afforded a sufficient basis therefor. (Per SHERWOOD, P. J., and BURGESS, J.)

17. ——: TESTIMONY OF ACCOMPLICE: OMITTING INSTRUCTION. In a. prosecution for receiving a bribe, the party giving the bribe having testified for the State, and having been treated as an accomplice by it, it was error for the court not to charge as to the caution with which his testimony should be regarded. (Per SHERWOOD, P. J., and BURGESS, J.)

18. ——: VOIR DIRE EXAMINATION: ACQUAINTANCE WITH OTHER INDICTED PERSONS. In a prosecution for receiving a bribe, it was error to permit the prosecuting attorney to ask the jurors on their *voir dire* if they knew certain other persons (naming them) then under indictment for bribery in the same court, the examination in this case on that point having gone too far.

19. ——: EVIDENCE OF OTHER ACTS. It was not competent to admit, evidence of another deal wherein the same go-between for defendant and his bribe-giver, and other members of the same council with defendant, were to receive a certain sum from the same alleged bribe-giver, defendant not being a party thereto.

20. ——: ASSEMBLY'S OPPOSITION TO BILL. It was competent for the State to show that the defendant induced the committee to which the franchise bill, to secure the passage of which the money was. charged to have been paid, was committed, to report the bill "without recommendation."

21. ——: BRIBE-GIVER'S EMPLOYMENT. It was competent for the State to show the alleged bribe-giver's employment to lobby the franchise bill through the council of which defendant was a member, and the furnishing of money to him by the president of the street railway employing him for that purpose.

Appeal from St. Louis City Circuit Court.—*Hon. Walter B. Douglas,* Judge.

REVERSED AND REMANDED.

*Boyle, Priest & Lehmann, Morton Jourdan* and
*Chester H. Krum* for appellant.

(1) The indictment is fatally defective and does
not state an offense. 1. The crime depends upon
bribe being paid in consideration of vote, decision,
opinion or judgment being corruptly given. 2. The
crime depends farther upon the corrupt vote being
given under an agreement: (a) That his vote, opin-
ion, judgment or decision shall be given for some par-
ticular person, or in some particular manner, or upon
some particular side, or more favorable to one side
than the other, in any question, election, matter, cause
or proceeding which may be pending or be brought be-
fore him in his official capacity; or (b) that he shall
neglect or omit to perform some official duty, or per-
form the same with partiality or favor, or otherwise
than according to law. To agree to oppose, resist,
withstand, thwart or defeat a certain measure is not to
agree to anything as required by any of the specifica-
tions of the statutes, especially as it is obvious from
the indictment, as a whole, that the offense intended
to be charged is corruptly favoring the bill in some
way. Something must be averred to have been agreed
to be given or done in behalf of the bill, and there is
no such averment. Furthermore, how was defendant
to resist? What was he to do? The indictment does
not say. And so through the category of oppose,
withstand, thwart and defeat. An indictment must be
precise and definite. State v. Burke, 151 Mo. 136;
State v. Crocker, 95 Mo. 393; United States v. Cruik-
shank, 92 U. S. 558. (2) The motion to require the
State to elect. 1. Where an indictment is double, the
defendant has either of two remedies. He may move
to quash, or, at the trial, may move that the State be
required to elect. State v. Henn, 39 Minn. 464; State
v. Goodwin, 33 Kan. 542; Scruggs v. State, 111 Ala.
60. 2. The indictment is double, because it contains
the statement of two offenses blended in one count. (a)

First part of indictment is complete in itself, stating an agreement in consideration of a gratuity to be more favorable to the bill. But it is vague and indefinite. (b) Second part of indictment is complete in itself, and alleges a different agreement with Philip Stock, in consideration of $9,000 to oppose, etc., the bill unless and until paid. The motion should have been sustained. State v. Walker, 67 S. W. 228. (3) 1. Section 14, article 3 of the charter of St. Louis was improperly admitted. It is a public law, and as such had no proper place in evidence. 2. Proceedings of council improperly admitted to show during what length of time no action was taken on Suburban Railway bill. (a) Evidence not part of *res gestae*. That could be only those facts attending the alleged bribe-giving. (b) Bill was then in committee of which defendant was only minority. He could not have controlled action had he wanted to do so. (c) When alleged bribe was given, the bill was out of committee and before the house for passage. Bill reported January 25, 1902; alleged bribe given February 2, 1902. 3. Evidence improperly admitted as to employment of Philip Stock by Turner to assist in passage of Suburban bill. (a) Evidence purely *res inter alios*. (b) No connection shown, whatever, between Turner and the defendant. 4. Evidence as to statements made by Charles Kratz to Philip Stock, erroneously admitted. (a) One cannot be bound by statements of another, unless they are shown to have been made with his knowledge or by his authority. Fogue v. Burgess, 71 Mo. 389; State v. Huff, 161 Mo. 487; State v. Foley, 131 Mo. 488. (b) Agency can not be proven by the admissions of the alleged agents. Beardslee v. Steinwesch, 38 Mo. 168; Sumner v. Saunders, 51 Mo. 89; Peck v. Ritchey, 66 Mo. 114. (c) In any event, there is no agency in criminal transactions. State v. McLaughlin, 44 N. E. 1025. 5. Evidence of Charles H. Turner as to legislative agency of Philip Stock, improperly admitted. 6. Incompetent evidence by Philip Stock as to value of shares of the Electric Con-

struction Company was admitted over defendant's objection. The indictment alleged that the shares were worthless. Stock testified that he did not know the value of the shares, saying, "No, I do not know anything about it." He was asked, "Now, what was the value, Mr. Stock, of these certificates at the time you got them from Mr. Meysenburg?" Objected to because witness has stated he does not know value. Overruled, and witness answered: "I do not know. I considered them of no value." Defendant moved to strike out last part of answer. State insisted that what witness considered them worth was competent and motion overruled. 7. Evidence offered by defendant to prove that the stock in the Electric Construction Company possessed a value improperly excluded. (a) The indictment alleges that $9,000 were paid to the defendant as the "pretended and ostensible price, consideration and value of certain worthless and unmarketable shares of stock of the St. Louis Electric Construction Company." (b) Nolker, for the State, was permitted to testify that the shares were worth nothing in 1901. (c) Defendant offered to prove that minority stockholders of the construction company, of whom defendant was one, claimed that the stock had been rendered valueless by improper conduct of the directors and hence shares did have at least a litigated value. This was excluded. Defendant offered to prove by F. N. Judson that defendant came to the witness on February 1, 1901, and consulted him as an attorney with reference to his claim against the directors, that at this consultation the shares of stock were referred to as the basis of the defendant's claim, and that the defendant was advised that he had a valid claim and could enforce it by appropriate litigation. This was excluded. 8. Defendant offered to prove by Charles B. Stark, that in 1900 he sold to August Gehner and others, including Stock and Nolker, three hundred and thirty shares of the construction company stock, for the sum of $16,000. These purchasers are directors of the company. The evidence was excluded. 9. Defendant offered to prove

that in 1898, one Ledley paid to defendant $3,533.33 and received therefor one hundred shares, par value $10,000, of the stock of the construction company. This was excluded. It seems idle to contend that the evidence thus excluded was not competent. (a) It was competent upon the question of motive and intent on the part of the defendant. (b) It was competent upon questions of value. (c) The evidence bore directly upon a substantial averment of the indictment, under which the State was permitted to introduce evidence, but under which the defendant was not permitted to introduce evidence. The court having permitted only one side to be heard on the proposition, then proceeded to ignore the question of value altogether—thus muddling the case in a most exquisitely grotesque manner. (4) Where there is a total failure of proof, it is the duty of the trial court to take the case from the jury. Where it refuses to do so, the judgment will be reversed and the defendant discharged. State v. Nesenhener, 164 Mo. 461; State v. Baker, 144 Mo. 330; State v. Shackelford, 148 Mo. 493; State v. Mahan, 138 Mo. 112; State v. Young, 119 Mo. 526. (5) The indictment averred that under the agreement the sum of $9,000, lawful money of the United States, was paid to the defendant by Philip Stock. The evidence was that no money was paid, but a check for $9,000 was delivered by Stock. This evidence did not support or tend to prove the averment. It was a total failure of proof. United States v. Deenicke, 35 Fed. 407; Hamilton v. State, 60 Ind. 193; Haden v. Memphis, 100 Tenn. 582; State v. Greenspan, 70 Mo. App. 468; State v. Banks, 118 Mo. 112; Carr v. State, 104 Ala. 43; Haney v. State, 9 Ark. 193; Berrien v. State, 83 Ga. 381; United States v. Graves, 65 Fed. 488; Thalheim v. State, 38 Fla. 169; People v. Coons, 45 Cal. 672; State v. Ray, 92 N. C. 810; Mondschein v. State, 55 Ark. 389; State v. Reed, 154 Mo. 133. (6) All of the instructions given by the court, upon the point of an express agreement, were erroneous, as there was no evidence to support either of them. 1. Each required an express

agreement to have been shown. There was no evidence of any agreement of any kind, express or implied. 2. Each left the jury to determine what was an express agreement. 3. The statute requires an agreement to give a vote, opinion, judgment or decision in some manner as indicated in the statute. These instructions all ignore the statute and proceed upon an hypothesis originated by the court. (7) Instructions 8 and 11, asked for by the defendant, ought to have been given. No valid reason can be given for the refusal of these instructions. They go the question of bona fides on the part of the defendant and ought to have been given. (8) The court erred in failing to fully instruct the jury. It was the duty of the court to take from the jury all the statements of Kratz testified to by Stock, and all the testimony of Stock as to interviews with or statements of Turner, and also all testimony as to transactions between Turner, Stock, Hospes, Wainwright and Nicolaus, because Meysenburg was not a party to them, and they were not brought to his knowledge. It was insisted by defendant, when the testimony was offered, that the State must first show its connection with him, but his contention was overruled. This was error. State v. Thomas, 99 Mo. 257; State v. Kuehner, 93 Mo. 197; State v. Frederick, 85 Mo. 147; State v. Hopper, 71 Mo. 425; State v. Millard, 58 Mich. 68; People v. Hall, 12 N. W. 665; 15 Enc. Plead. and Prac., p. 393. (9) Stock was presented by the State as an accomplice in the crime charged against Meysenburg, and Kratz was also an accomplice if there was any truth in Stock's statements. Hearsay testimony, in whatever source originating and through whatever channel conducted, is always to be received with caution, if ever received. The testimony of an accomplice is always to be cautiously considered, and, uncorroborated, must carry strong intrinsic warrant of truth to justify a conviction. Here was hearsay evidence delivered by an accomplice; evidence of doubtful character by a witness of undoubted bad character. But while the court took pains

to caution the jury against Meysenburg, because he was a defendant, there was not one word of caution against Stock, the accomplice, and his hearsay testimony as to what was said by Kratz and Turner, other accomplices. This was error. State v. Crab, 121 Mo. 554; State v. Dawson, 124 Mo. 418; State v. Minor, 117 Mo. 302; State v. Hawkins, 100 Mo. 666; State v. Donnelly, 130 Mo. 642.

*Edward C. Crow*, Attorney-General, and *Joseph W. Folk*, Circuit Attorney, for the State.

(1) The indictment is sufficient. The sufficiency of the indictment in this case was challenged for the first time after the verdict. The policy of the law is to require all objections to form and uncertainty of averment to be made before trial, or they will be waived and cured by verdict; and the rules of pleading are being continually relaxed and liberalized, as is being manifested by our statute of jeofails, which, among other things, provides that, ''no indictment or information shall be deemed invalid, nor shall the trial, judgment or other proceedings thereon be stayed, arrested or in any manner affected by any surplusage or repugnant allegations, when there is sufficient matter alleged to indicate the crime and person charged; nor for want of averment of any matter not necessary to be proved; nor for any other defect or imperfection which does not tend to the prejudice of the substantial rights of the defendant upon the merits.'' R. S. 1899, sec. 2535. And upon the subject of insufficiency and duplicity of allegations being cured by verdict see 1 Bishop's New Criminal Procedure, section 443 (3), and section 707. The question is, does the indictment contain all the allegations necessary to charge the offense created by the statute? The only objection made to the indictment was what the counsel termed a motion to require the State to elect between the two charges alleged to be contained in two paragraphs of the indictment. It is evident that but one charge is preferred or intended; the counsel's motion was, in legal

effect, only an objection *ore tenus* to the introduction of evidence; and this can not be done, but a motion to quash or demur must be resorted to. State v. Meyers, 99 Mo. 107; State v. Risley, 72 Mo. 609. So that the sufficiency of the indictment in matters of substance, and not form, is the present inquiry. While the averments of the indictment are not jointed as smoothly as the critical and artistic sense of counsel for defense would prefer, yet we insist that it states a charge under the statute with sufficient clearness to be readily understood by the reasonably intelligent. The two paragraphs are not two charges. The first alleges substantially in the language of the statute that the defendant, in his official capacity, solicited and accepted a gift, under an agreement that he would discharge his official duty regarding a certain measure more favorably thereto, with partiality and otherwise than according to law. Then the second paragraph simply elaborates and makes definite the preceding paragraph, by specifying: 1. The person with whom defendant made the corrupt agreement, to-wit, Philip Stock. 2. The consideration paid to defendant for his official favor, to-wit, $9,000. 3. The nature of that official favor, to-wit, desistance from opposing, resisting, etc., the proposed legislation. (2) But counsel's sense of repugnance is shocked by the allegation that the "express understanding and agreement" was that "unless and until" the $9,000 were paid to him he "would and should oppose," etc., the passage of the proposed measure. There is nothing in this allegation to befuddle a normal mental conception; for it is tantamount to a direct statement that defendant was opposing a measure, and that he agreed, in consideration of the $9,000, to cease said opposition. It was unnecessary to allege, and it is utterly immaterial whether, as a matter of fact, defendant did carry out his corrupt contract and cease opposition to the measure; for it is accepting a gift under an agreement to be influenced thereby, that is fulminated against by the law. (3) Statements made to Stock by Kratz, in the absence of

State v. Meysenburg.

Meysenburg, were competent, because, first, Kratz was the manager and the agent of Meysenburg, and, second, said statements were with reference to the promotion of a conspiracy between the three to commit a felony. Before the admission of Stock's testimony concerning the statements made to him by Kratz, the State had proved as follows: (a) That Stock was engaged by Turner, the president of the St. Louis and Suburban Railroad Company, to secure the passage of the bill alleged in the indictment to have been intended for that road's benefit. (b) That two certain certificates for two hundred shares of St. Louis Electric Construction Company stock were obtained by Stock from defendant, and a certain cashier's check for nine thousand dollars, obtained by defendant from Stock, on February 2, 1901. (c) That, without himself having had any conversation with the defendant with reference to said shares, or with reference to said check, Stock, accompanied by Charles Kratz, went to defendant's office on February 2d, and the following significant things occurred: 1. Kratz said to defendant: "Mr. Stock is here to settle for those shares." 2. Stock said to defendant: "I understand that our people had not treated him properly, and I wanted to show we do by paying the amount asked, although the shares were of no value." Then defendant turned to Kratz and said: "Charley, you know very well I do not want anything but what is fair and square; I merely want to get the money which I laid out." 4. Stock then handed defendant the check for $9,000, and defendant handed Stock an already-prepared statement of moneys, $8,966.58, alleged to have been expended by defendant, and $33.42, the exact change. 5. As Stock was about leaving, defendant said: "Now, Mr. Stock, I want you to distinctly understand that this is a strict business transaction, and that it will not influence my vote respecting the Suburban bill." 6. Kratz remained with the parties during the five or ten minutes consumed by the aforesaid transaction and left with Stock. Now, upon the above facts being shown, it was palpable that

Kratz, who came with Stock to defendant's office, and who introduced the subject with the statement, ''Mr. Stock is here to settle for those shares,'' was the person who had conducted the negotiations between Stock and defendant; was the intermediary through whom both minds had come together in an agreement and had prepared both ready for a quick exchange of properties. Kratz was, first, the mutual agent or messenger of both Stock and defendant; second, he was one of three persons engaged in the conspiracy to commit this particular felony; and, third, he was a conspirator with them to bribe the measure through the council, it being admitted by counsel for defendant that Stock and Turner had put up $60,000 to be used by Kratz for that purpose. Accordingly, after this situation was developed by the evidence, the court properly permitted the State to show by Stock, as follows: 1. That Stock asked Kratz in January (prior to 11th) why the railroad committee did not report the bill, and Kratz said he would find out; that a few days thereafter Kratz reported to Stock that defendant claimed he had a grievance against the parties seeking the franchise. 2. That after writing Kratz, Kratz reported to Stock that defendant wanted $9,000. 3. That at the solicitation of Kratz, Stock went to the defendant's office to take up the shares, in order to have the good will of defendant. This testimony was properly admitted upon the theory that Kratz was the agent of defendant in the negotiations; and also because they were the statements of a co-conspirator during the existence of the conspiracy. But it is contended that agency can not be proved by the admission of the alleged agent. We do not attempt to do so, but insist that agency could be fairly inferred from the aforesaid facts, and especially from the occurrences between the three parties at Meysenburg's office on February 2d, and that defendant's conduct on that occasion was tantamount to an admission of such agency. Said occurrences also proved very clearly the existence between the three of a conspiracy to commit both the felony of this particu-

lar bribery, and the passage of the proposed bill by bribery; and the statement of either one to the other, or to any outside person, during said conspiracy and in furtherance thereof, was competent.   It is contended by defendant that "there is no agency in criminal transactions."   No, not an agency, the claim of which will exempt the agent if he knew the criminal nature of the act he was doing for his principal.   But there is an agency recognized in all law, which makes the word or act of the agent the word or act of the principal, if said or done with his authority, and that, too, regardless of the agent's knowledge of his principal's criminal purpose.   The occurrence at defendant's office could not be explained or understood upon any reasonable hypothesis except that of Kratz having already acted with Stock for and on behalf of defendant, and in the manner directed and understood by defendant. It will not be necessary to cite authority for the proposition that agency, and the extent of the authority of the agent may be inferred from circumstances.   Mitchum v. Dunlap, 98 Mo. 418; Hull v. Jones, 69 Mo. 587; 2 Greenleaf, Ev., sec. 60; Wharton, Cr. Ev., sec. 833.   Or by ratification—the defendant consummating and agreeing to what had been done by Kratz.   2 Greenleaf on Evidence, sec. 66.   And when the relation of principal and agent in a particular transaction is established, the agent's admissions and statements may be imputed to the principal; and hence, says Mr. Wharton, the declarations of a messenger sent to a third party by the defendant, if made with reference to the object of the mission, are admissible in evidence against him. Wharton, Cr. Ev. (9 Ed.), sec. 695.   And any admissions or statements made by the agent during the transaction, or in the commission of the tort, or during the conspiracy, are admissible as a part of the *res gestae*. Wharton, supra, and note; Price v. Thornton, 10 Mo. 135; 1 Greenleaf, Ev. (16 Ed.), sec. 184c; Dyer v. State, 88 Ala. 225.   (4) Again, the testimony was competent on the theory of a conspiracy.   The commission of this offense of bribery was to operate for the benefit

of three persons. It was to assist Stock in securing a valuable franchise. Kratz already had a large amount deposited for his benefit if the measure became a law, and the defendant got $9,000. They were jointly interested, and had a common purpose in view during the negotiations between the three; and the occurrences established by the evidence before the admission of the alleged incompetent testimony, showed such an unlawful conspiracy to have existed, making the statements of each admissible against the others. Stock, Kratz and the defendant could all have been jointly indicted for this transaction, or could have been charged with a conspiracy to commit the offense. Stock and Kratz were both aiders and abettors before, and indeed at the fact, of Meysenburg's bribery, and therefore, under our statutes, were chargeable directly as principals; and from the time that Kratz went to Meysenburg and learned from him that he had a grievance and wanted $9,000, until that amount was paid and the contemplated crime was consummated—that is to say, during the existence of the unlawful combination or conspiracy— the acts and declarations of each became competent against the other. State v. Ross, 29 Mo. 32; State v. Daubert, 42 Mo. 239; Spies v. People, 122 Ill. 1; State v. Munchrath, 78 Iowa 268; United States v. McKee, 3 Dill. 551; 1 Bishop's New Cr. Prac., sec. 1248, and citations; United States v. Goldberg, 7 Biss. (U. S.), 189. And the above is the rule, although the transactions and statements may have occurred from time to time and much prior to the consummation of the crime. State v. Walker, 98 Mo. 95; State v. Melrose, 98 Mo. 594; State v. Minton, 116 Mo. 605; State v. Cardoza, 12 S. Car. 197; State v. Desforge, 48 La. Ann. 77. When the evidence established prima facie, in the opinion of the judge, the connection of the individuals in the unlawful enterprise, every act and declaration of each member of the confederacy with reference to the common object is, in contemplation of law, the act and declaration of them all, and is, therefore, original evidence against each. 1 Greenleaf on Evidence (Lewis Ed.),

sec. 111. But the rule that a conspiracy must first be established prima facie before the acts of one confederate can be received against another, can not well be enforced when the proof depends upon a large number of circumstances. In any case where the whole evidence shows that a conspiracy actually existed, it must be considered immaterial whether the conspiracy had been shown at the time proof was received of the acts and admissions of the confederate. State v. Walker, supra; Johnson v. State, 29 Ala. 62; Loggins v. State, 12 Tex. App. 65; 6 Am. and Eng. Ency. of Law (2 Ed.), p. 869. And so we repeat, that before the alleged incompetent testimony was admitted, sufficient evidence of the conspiracy had been offered; but even if it had not been so offered at that time, yet the testimony was competent if the whole case showed the existence of such conspiracy. Rath v. State, 35 Tex. Crim. Rep. 146. (5) The testimony of Stock as to what Kratz should have said regarding the attitude of Meysenburg to the pending bill, was admissible to illustrate the conduct of the witness Stock in his dealings with Meysenburg and Kratz. State v. Northey, 77 Cal. 632. Where an alleged sale of property is used as a cloak and cover for a bribe, the court will look through the mythical transaction and give the act its legal criminal effect. State v. Rath, 35 Tex. Crim. Rep. 149. (6) The sale of the stock of the Electrical Construction Company in this case was a mere cloak for the reception of the $9,000 bribe to influence the official action of the defendant, and the gravamen of the offense interdicted by the statute is the intention to and the influencing of the official action of the officer by giving him a bribe. State v. Graham, 96 Mo. 124. (7) The proposed testimony of F. N. Judson, lawyer, in regard to professional opinion given Meysenburg, was properly rejected. It was utterly irrelevant for it is a well-established rule that the advice of counsel furnishes no excuse for the violation of law. 1 Am. and Eng. Ency. of Law (2 Ed.), p. 897; Barnett v. State, 89 Ala. 170; People v. Krane (Sup. Ct.), 15 N. Y. Supp. 612; Weston v. Com-

monwealth, 111 Pa. St. 251. On the trial of one for murder, testimony that the defendant had consulted' counsel, and had by counsel been advised that he had a legal right to maintain possession of the land, in a dispute about which the alleged murder took place, was held not to be admissible in evidence. Weston v. Commonwealth, 111 Pa. St. 251. It is no defense to a criminal prosecution that the accused acted in good faith, and under legal advice—that he had a right to perform the act. Gardner v. People, 62 N. Y. 299; State v. Marsh, 36 N. H. 196. (8) The court properly excluded the testimony offered by the defendant with reference to value of the stock. As hereinbefore stated, the matter of the value of the stock was utterly immaterial. The fact that the indictment alleged it to be valueless does not make it an issue unless it is otherwise material to the inquiry. Immaterial and unnecessary allegations are rejected as surplusage, under our statute of jeofails and under many decisions of this court. The material inquiry in regard to said stock was whether the defendant gave it bona fide in exchange for the $9,000; or whether the stock was merely a cover for his accepting the money to influence his official action. And this matter was put to the jury very fairly in instructions 5, 6 and 7. But it will be replied that the State introduced evidence upon the question of value of the stock. Yes, but the defendant did not object to it as immaterial; and the fact that one party is permitted to introduce immaterial evidence without objection, does not entitle the other party to introduce like immaterial evidence if objected to, as it was in this case. And again, in no instance did either of the witnesses offered by defendant to prove value, qualify as competent to testify on that subject. Witness Charles B. Stark knew of the value of the stock only by what he sold some of it at in the spring of 1900, and not upon the open market, but under peculiar circumstances not giving a price to other shares. And witness Meysenburg could only testify that in 1899 some stock had been

Vol 171, mo—2.

taken up by one Ledlie, attached as collateral to a promissory note. We submit that value can not be proven in that way. But, according to defendant's own testimony, on February 2, 1901, he held no claim against the individuals composing the Kinloch syndicate; for any claim of that character was adjusted by the three notes of Hanford, Kobusch and Sutter, each for $3,333.33, and each secured by a certificate of one hundred shares of stock as collateral. Hanford paid his note and took up his certificate, and subsequently the notes of Kobusch and Sutter were discharged and delivered to them in consideration for their two certificates becoming absolutely the property of defendant, and Sutter's guaranty that defendant should realize out of the stock the amount of the two notes thus surrendered. So it is plain that defendant's alleged claim against Stock et al., constituting the alleged syndicate, had been completely wiped out, and on February 2, 1902, not the shadow thereof remained. And again, defendant says distinctly that he did not sell Mr. Stock said shares, but simply sold them as collateral. Collateral for what? Why, they were not then collateral for payment of any notes, nor for any claim against the electric company or syndicate; but could only be regarded as collateral for the personal guaranty of Sutter above referred to. So, again we say, that all this talk about the value of said stock as affording any claim against Stock et al., as members of the syndicate, was utterly irrelevant, and the court properly so ruled. (9) There was no variance between the allegation and proof. The contention of variance on the ground that the indictment alleged the payment of $9,000 and the proof showed a check for that amount, is without any merit whatever. The check certified that the bank held $9,000 which would be paid on the order of Philip Stock; and upon his indorsing his order thereon, and delivering it to defendant, he got the actual money, a part of it immediately after Stock left defendant's office. Getting the actual money was a part of the same transaction of the *res gestae*. What difference

whether the money was paid by Stock in person, or by his agent, the bank, on his order? It would in either case be properly pleaded as a payment by Stock. The cases cited by defendant are not in point; but are cases of larceny, etc.—crimes against property where there is a misdescription of the thing stolen or of the note forged, etc. Whoever heard before of an allegation of payment in money not being supported by proof of money paid on behalf of the payer by his agent on order or check? If the property is the subject of the crime, as money being alleged to have been stolen and the proof showing a check; or the allegation being forgery of a promissory note and the proof showing forgery of a bank bill, then there is room for claiming variance. (10) There was no variance between the allegation and proof upon the subject of express agreement. The indictment alleges an express contract between Philip Stock and the defendant; and it is insisted by the defendant that the contract proved was merely an implied one. This question was argued at great length, both on behalf of the State and on behalf of defendant. We would suggest, however, that the indictment sets out just what the understanding or agreement was; and that being the case, it is absolutely immaterial how it may be designated. Characterizing the agreement as being express or implied can not change the legal effect thereof as pleaded. However, the agreement, as alleged and proved, was certain and express. There was no implication; but as a result of Kratz's message between Stock and defendant, it was thoroughly understood between them that the object and result of the deal was to be a cessation of defendant's obstruction to the bill. Not expressed in definite words or writing, but the understanding and acquiescence of the two minds were as complete as if the covenant had been under lawful seal. One understood that he was buying and the other understood that he was selling, official non-resistance to the proposed ordinance. The most satisfactory definition of an express contract or agreement is found in the very recent work of the Hon.

Alexander Martin on Civil Procedure (1899), p. 52. See, also, Keener, Quasi Contracts, 222. (11) The instructions given by the court seem to be as fair and favorable to defendant as could be required; and no substantial fault can be found with them, notwithstanding defendant's labored effort in this direction. It is complained that the court left to the jury to determine what an express agreement is. Not at all. Instruction 2 defines the meaning of the term as fully as the court could well do without indulging in a comment on the evidence. The instruction necessarily had to be in general terms, and is not open to the hair-splitting criticism of defendant. And it was perfectly proper for the jury to be told that such agreement could be made by a third party acting for and in behalf of defendant; for, the theory of the State was, and the facts showed, that the agreement and understanding between Stock and Meysenburg had been reached through Kratz, as an intermediary. Instruction 1 is complained of on the ground that it ignored the question of value of the stock. The value being immaterial, as hereinbefore stated, there was no occasion for the court to incorporate anything in that regard in its instruction. It is insisted by defendant, in this connection, that "there was no pretense of a claim against the company at the time of the transaction involved." But it will readily appear that when defendant sought to introduce testimony in regard to the value of said shares of stock, it was upon the theory that defendant held an enforcible claim against said company; and the defendant, in his testimony, insisted that he did not sell the shares of stock for the $9,000, but sold the aforesaid claim. It is hardly worth the while to resist the contention of defendant that instruction 3 was erroneous, in that it does not require the defendant to do anything after payment of the bribe; for desisting from action comes as clearly within the term of the statute as does aggressively doing a thing. Instructions 8 and 11, requested by the defendant and refused, were properly refused because the substance thereof had been

covered by instructions given; and said instructions 8 and 11 left out of consideration the question whether the shares of stock were sold in good faith or merely as a cover for bribery. It is further urged that the court failed to instruct the jury upon the law, in that no instruction was given upon the subject of testimony of an accomplice. No such instruction was asked on behalf of defendant, and even if it were admitted that the bribe-giver and the bribe-taker were accomplices, yet such an instruction should have been properly refused; for it has been repeatedly held in this State that a conviction may be had upon the uncorroborated testimony of an accomplice; and that when, in the opinion of the court, such testimony has been corroborated, no instruction need be given cautioning the jury in regard to the testimony of such a witness. State v. Sprague, 149 Mo. 409; State v. Koplan, 167 Mo. 298.

GANTT, J.—I. The circuit attorney evidently was endeavoring to charge an offense under section 2085, Revised Statutes 1899, the gist of which is the corrupt acceptance directly or indirectly of any gift, consideration, gratuity or reward or any promise or undertaking to make the same, by any judge, or justice of the peace, member of the Legislature, or officer or employee thereof, or any other public officer of this State, or of any county or city, town or township thereof, under any agreement, that his vote, opinion, judgment or decision shall be given for any particular person, or in any particular manner or upon any particular side, or more favorable to one side than the other, in any question, election, matter, cause or proceeding which may be pending or be brought before him in his official capacity, or that he shall neglect *or omit to perform any official duty or perform the same with partiality or favor* or otherwise than according to law.

The indictment very fully alleges the official character of the defendant, to-wit, the incorporation of the city of St. Louis as a municipal corporation and that

its legislative power is vested in a Council and a House of Delegates, styled the Municipal Assembly of St. Louis; that defendant was a member of said Council and Municipal Assembly, duly elected, qualified and acting as such.   He was an officer, the bribing of whom would constitute an offense under the statute and more properly so, because "the danger to which public rights and private property is exposed from dishonest municipal administration is certainly as great as from corruption on the Bench or in the Legislature." [People v. Jachne, 103 N. Y. 192.]

The averment that there was then and there pending and undetermined before the said Municipal Assembly for the consideration, opinion, judgment and decision of its members and before said Meysenburg as a member thereof, a measure, matter and proceeding in the nature of a proposed ordinance of said city, known as Council Bill No. 44, by which it was proposed to grant certain valuable rights and franchises to the St. Louis & Suburban Railway Company, a railroad corporation, whereby it should be permitted to lay its tracks and run its cars upon and over certain streets, and that it was the public official duty of defendant as a member of said Council to give his vote, opinion, judgment and decision on said bill or ordinance *without partiality or favor,* was also well and sufficiently pleaded.   Then follows a charge in general terms that defendant corruptly, feloniously, directly and indirectly solicited, proposed, procured, accepted and received a certain gift under an agreement that his vote should be more favorable to the passage and enactment of said measure or Council Bill No. 44, and would perform his official duty with partiality and favor and otherwise than according to law.   It is obvious that this general statement falls short of advising the defendant of "the nature and cause of the accusation against him," which our Constitution guarantees every individual charged with crime, in this, that it does not name the person or corporation from whom he received the gift or bribe or the nature, amount or char-

acter thereof.   Had these allegations been made with
proper and sufficient clearness  and  then  concluded
"against the statute in such case made and provided
and against the peace and dignity of the State," we
think it would have been unobjectionable, but in and
of itself, we think it is obviously  insufficient and the
learned counsel for the State, both in the oral argument
and brief, did not insist it was sufficient, but urged that
so much of the indictment was merely inducement to
that which follows:

Accordingly we must  determine whether the re-
maining portion is sufficient, treating the part we have
already considered as mere inducement or surplusage.
It is in these words:   "That he, the said Emil A. Mey-
senburg, did then and there unlawfully, corruptly and
feloniously, solicit, propose, procure, make and enter
into a certain corrupt bargain, agreement and covenant
with one Philip Stock (who was then and there the
agent and representative of the said St. Louis and Su-
burban Railway Company, its officers and members and
was then and there acting for and in behalf of the said
St. Louis and Suburban Railway Company, its officers
and members, as he, the said Emil A. Meysenburg then
and there well knew), by and under which said corrupt
bargain,  agreement  and  covenant a large  sum of
money, to-wit: the sum of nine thousand dollars, law-
ful money of the United States, was paid him, the said
Emil A. Meysenburg, by the said Philip Stock, as the
pretended and ostensible price, consideration and value
of certain worthless and unmarketable shares of stock
of the St. Louis Electric Construction Company, then
and there had and held by him, the said Emil A. Mey-
senburg, upon the express understanding and agree-
ment between the said  Emil  A. Meysenburg and the
said Philip Stock, that  unless  and  until  the said
sum  of nine  thousand  dollars  was so  paid  by
the said Philip Stock to the said Emil A. Meysenburg,
as the said pretended and ostensible price, considera-
tion and value of the said shares of stock he, the said
Emil A. Meysenburg, as a member of said Council and

in his said official capacity and character as aforesaid, would and should oppose, resist, withstand, thwart and defeat the passage and enactment of said measure, matter, cause and proceeding and of the said proposed ordinance, then and there as aforesaid pending and brought before the said Council and before him, the said Emil A. Meysenburg, in his said official capacity and character as a member of said Council. Contrary to the form of the statute in such case made and provided and against the peace and dignity of the State."

In this portion of the indictment the defect already noted in the inducement, to-wit, that it did not state from whom Meysenburg corruptly received the gift, gratuity and bribe, nor the amount and character thereof, is cured, and it is sufficiently averred that the corrupt agreement was made with Philip Stock, who was then and there the agent and representative of the said St. Louis and Suburban Railway Company, its officers and members, and who was then and there acting for and on behalf of said railway company, its officers and members, and that Meysenburg then and there well knew this, and that by and under a corrupt agreement, nine thousand dollars, lawful money of the United States, was paid to him, the said Meysenburg, by the said Philip Stock, and to give the defendant express notice of what the State intended to show and prove, it was alleged that this money or bribe was paid to Meysenburg as the pretended and ostensible price of certain worthless and unmarketable shares of stock of the St. Louis Electric Construction Company, then and there held by him, the said Meysenburg.

So far the pleader was pursuing the rules of good pleading, but the remainder of the indictment fails to charge that this money so received was for a purpose which would make it bribery under section 2085, Revised Statutes 1899, the substance of which we have already copied, in that it nowhere alleges that said money was received by Meysenburg on an agreement either that his vote, decision or opinion would be given in a particular manner, that is, to say, in favor of the

passage or enactment of said Council Bill No. 44, granting said privileges and franchises to said St. Louis and Suburban Railway Company, or would be more favorable to said Council Bill No. 44, or that he would perform his said official public duty in the consideration of said bill or measure *with partiality or favor* and otherwise than according to law and with impartiality.

The crime is statutory and it is essential that it should charge with certainty and precision all the facts necessary to constitute the offense, and must conform to the language or state all the facts which bring it within the terms of the statute. [State v. Kesslering, 12 Mo. 565; State v. Davis, 70 Mo. 467; 5 Cyclopedia of Law and Procedure, 1042, and cases cited.] In a word, the indictment must, on its face, by plain allegations, *not by inference merely,* charge some act described by the statute as constituting bribery.

Instead of so charging, the indictment proceeds to aver that said nine thousand dollars was paid to said Meysenburg "upon the express understanding and agreement between the said Emil A. Meysenburg and the said Philip Stock that *unless and until* the said sum of nine thousand dollars was so paid by the said Philip Stock to the said Emil A. Meysenburg as the said pretended and ostensible price, consideration and value of the said shares of stock, he, the said Emil A. Meysenburg as a member of said Council and in his official capacity and character as aforesaid, would and should *oppose, resist, withstand, thwart, and defeat* the *passage and enactment of said measure,* matter, cause and proceeding and of the said proposed ordinance, then and there pending before the said Council, etc.

Now these words do not plainly charge an agreement for favorable or partial action in favor of the bribe-giver Stock or his principal, the Suburban Railway but a threat to oppose, resist, withstand, and defeat the bill or ordinance "unless and until" he was paid. Learned council for the State, however, insist

that this is tantamount to an allegation of a promise of official favor, to-wit, "*desistance* from opposing," resisting, etc., the proposed legislation; that it was in effect a direct statement that defendant was opposing the measure and that he agreed in consideration of the $9,000 to cease said opposition.

But is it not plain that this is an inference counsel draws, instead of a direct allegation? We are dealing with a criminal charge in a felony case. Nothing is left to intendment in such case. There is no allegation that defendant had taken any prior position, whatever, on the Suburban bill; no averment that he was opposing it, and that Stock bribed him *to cease* his opposition; there is no averment of any promise in this language of an agreement that his vote, opinion, judgment or decision should thereafter be given for the bill, or that he would omit to perform his official duty when it came before him, for his consideration or vote, by ceasing to oppose and resist the passage of said ordinance, or that he would perform his duty with partiality and otherwise according to law. The language is certainly unfortunate if the intention was to charge the receipt of a bribe under a promise to cease opposition to the bill. We agree that it is just as reprehensible and criminal to accept a bribe to cease opposition to a bill or measure in a legislative body as it is to accept a bribe to advocate a measure. Public duty and official integrity demand and require that the legislator shall hold himself free to consider the merits and demerits of any measure brought before him in his capacity as such, and the acceptance by him of a bribe to affect his action one way or the other is within the condemnation of the statute. If he accept a bribe to *omit to perform* some official duty he is guilty under the statute. If upon an impartial consideration of a measure or bill introduced, he would deem it his duty to oppose and resist its passage, it is criminal in him to accept a bribe *not to oppose it*. While the learned council for the State construe the indictment

to charge that the bribe was received on a promise or agreement *to desist* from opposition to the bill, or would cease to do so when the nine thousand dollars was paid to him, or *would desist from his prior opposition,* we think it perfectly obvious that the indictment contains neither of these averments, save by inference.

It can not be that an agreement to withstand, oppose and resist the passage of a bill *until* a certain sum is paid is the same as an agreement for a bribe to cease opposition in the future or for favorable action in the future.

It nowhere charges that he had prior to that time been opposing the measure and agreed in consideration of the bribe to desist from further opposition, or would even cease when he received the $9,000, nor any promise whatever as to his conduct in the future as to said legislation, but simply and only that he agreed that "unless and until the $9,000 was paid, he would oppose, resist and defeat the measure", and yet the statute requires that he should not directly or indirectly accept the gift under an agreement that he would omit his duty or act partially in the future.

Counsel correctly argue that it is wholly immaterial whether defendant carried out his agreement and ceased opposition or subsequently supported the bill; the offense was complete if he accepted the bribe under an agreement either to cease his opposition to the bill or to support it by his vote, judgment or decision. The gravamen of the crime is the acceptance of the bribe under a corrupt agreement.  [State v. Williams, 136 Mo. 293.]

The rule as to certainty is so absolute and general that extended citation is entirely unnecessary. Judge SHERWOOD has demonstrated the rule by numerous apt quotations from the courts of last resort. Our conclusion is that the indictment is insufficient and that the defect is available for the first time in this court, though no motion to quash or demurrer was lodged against it in the circuit court, for the reason that it al-

leges no promise to be more favorable to the ordinance or to cease opposition thereto in the future.    [State v. Meyers, 99 Mo. 112.]

The writer speaking for himself does not think it objectionable to allege that the $9,000 was "the pretended and ostensible price, consideration and value of certain worthless and unmarketable shares of stock," etc., as it is plain that the State intended to show that the stock transaction was a sham and false pretense to cover up the alleged bribe, and if such was its purpose, the rule of certainty required that it should advise the defendant.    Without an allegation that the transfer of the shares of Electric stock was "pretended and ostensible" and a mere cloak for the bribe, would the defendant be prepared to meet such a claim on the trial? I think not, and, hence, I see no objection to that averment.

II.    The next proposition urged is, that, even granting the indictment was sufficient, there was a fatal variance between the allegation in the indictment that $9,000 lawful money of the United States was paid defendant, and the evidence offered in support thereof, which was that Meysenburg received a cashier's check of the German Savings Institution for $9,000. This point was not urged at the time the check was introduced, but was made in the argument of Judge Krum in support of the demurrer to the evidence, or instruction asked by defendant that the jury should acquit the defendant.

The point is important.

It was not necessary to allege the value and kind of money received as a bribe.    [2 Bish. Crim. Proc., secs. 75, 126, 127, and note 6 to 127; Leeper v. State, 29 Tex. App. 154.]

And Bishop lays it down that the proof need not be *exactly* the sum charged in the indictment, but proof of any larger or smaller sum will equally suffice. [Bishop's Directions and Forms, sec. 250, note 1; 1 Bishop's Crim. Proc., sec. 488b.]

As neither the crime nor its punishment depends

upon the value, so that some value is alleged and proved, the amount of the bribe is not descriptive of the offense, and need not be proved, just as laid, but it suffices to prove the substance of the issue. [1 Bishop New Crim. Pro., 488 2.]

In Watson v. State, 39 Ohio St. loc. cit. 126, in a prosecution for bribery the court said: "It is not necessary to allege or prove the quantity of value, where that is not an essential element of the crime. Under the statute it is not material whether the value of the thing offered is great or small, if it is in fact valuable. Money necessarily imports value." To the same effect are Com. v. Donovan, 170 Mass. loc. cit. 240; Com. v. Hussey, 111 Mass. 432; State v. Howard, 66 Minn. loc. cit. 314.

And in this State our statute as to variances has greatly modified and changed the common law on this subject. Thus in State v. Nelson, 101 Mo. 478, it was conceded that to sustain an indictment for larceny at common law the goods alleged to have been stolen must be proved to be either the absolute or special property of the alleged owner. Still under the Revision of 1889, section 4114, it was unanimously ruled that where the allegation of ownership was in the mother but the proof was in her daughter, the variance was held not fatal. And the same conclusion was reached in State v. Crow, 107 Mo. 345, and State v. Harl, 137 Mo. 252, and numerous other cases cited. It is too clear for argument that the fact that the proof was that defendant really obtained $33.72 less than the $9,000 was in no sense a material variance.

The case cited from 1 Camp. 494, Rex. v. Plestow, as to proving a false pretense, and the case of Hamilton v. State, 60 Ind. 193, were both cases in which the representation in the one and the property alleged to have been stolen in the other were descriptive of the offense, but we are not advised whether the State of Indiana has a statute of jeofails similar to ours, but it is obvious no note was taken of it in the opinion. Such a variance would be disregarded under our statute un-

less the circuit court should deem it prejudicial and in
the absence of such a finding it would be presumed
he did not so deem it.   In our opinion this variance
would not have been reversible error of itself.

III.   But it was urged with great earnestness and
ability, both in the circuit court and in this court, that
the State utterly failed to establish "an *express*
agreement between Meysenburg and Stock" and that
while it was unnecessary to have made such allegation
so specific, the State was bound to prove it, the agree-
ment being an essential part of the offense, the partic-
ular kind of agreement, to-wit, an express agreement,
must have been proven to authorize a conviction.

It is assumed as the basis of this argument that
there was no proof of an express agreement between
Stock and Meysenburg.   It need not be stated that an
agreement presupposes at least two parties, as one
party can not make an agreement with himself alone.

Express agreements may be either in writing or
verbal, and the latter, in the absence of a statute re-
quiring them to be in writing, are just as obligatory
as if they were in writing.

Ordinarily, express agreements are used in con-
tradistinction to implied agreements or contracts. "All
express executory agreements or contracts, upon an-
alysis, resolve themselves into an offer by one of the
parties, and an acceptance of that offer by the other.
The act of acceptance closes the contract, and ordi-
narily nothing further is required to make the agree-
ment effective.   No special formalities are required."
[7 Am. and Eng. Ency. Law (2 Ed.), p. 125.]   "If the
proposal is explicit, the assent of the other party to it
may be indicated by word of mouth, as well as by writ-
ing; and it may be shown *by acts, for acts may be as
clear an indication of intent as words can be.*"   [7 Am.
and Eng. Ency. Law (2 Ed.), p. 129.]

Recurring now to the facts in evidence, did they or
did they not establish an express agreement between
Stock and Meysenburg?

Stock testified: "I telephoned Mr. Meysenburg on February 2, 1901, in the morning, that I would like to meet him between ten and eleven and the answer came back that he would be in. Mr. Kratz and I went over to Mr. Meysenburg's, and Mr. Kratz said, 'Mr. Stock is here to settle for those shares.' I then stated that I understood our people had not treated him properly, and I wanted to show we do, by paying the amount asked, although the shares were of no value. He then turned to Mr. Kratz and said, 'Charlie, you know very well I do not want anything but what is fair and square, I merely want to get the money which I laid out.' He then handed me a statement and these shares, stating he had expended so much money—I did not look at the statement at all, and handed him over the check, and he in turn gave me the balance between the statement and the check, which was about $33.42, I believe; he gave me that in currency. I think I was about leaving when Mr. Meysenburg said to me, 'Now, Mr. Stock, I want you to strictly understand that this is a strict business transaction and that it will not influence my vote respecting the Suburban bill.' Then I left with Kratz."

If it were a controversy solely as to whether Meysenburg had previous to this interview agreed on his part to accept $9,000 for his two hundred shares of Electric stock and that Stock on his part had agreed to pay that sum for the shares, there could not arise a doubt that there was an *express* agreement to that effect. The conduct and acts of these parties are utterly inexplicable upon any other reasonable hypothesis. While it is true, if we exclude what Kratz had represented to Stock in the absence of Meysenburg, there is no direct evidence of any previous convention between Stock and Meysenburg, reason and common experience at once rejects the conclusion that Stock on the one hand, without any previous understanding, directly or indirectly, with Meysenburg, would have gone to the bank and

bought a cashier's check for $9,000, payable to the order of both Stock and Meysenburg for $9,000, and indorsed his own name on it, in blank, and then fixed a time for meeting Meysenburg at his office, and gone there at an appointed time if he had not understood Meysenburg was to accept and receive the check or its equivalent in money, and turn over the shares to him. His conduct can not be explained on any other hypothesis. On the other hand, it is equally incredible that Meysenburg, ignorant of any intention on Stock's part to make such an offer and without any previous agreement would have sat down in his office on that particular day and made out an itemized statement of his claim against the Electric company aggregating $8,966.58 and placed with it his two hundred shares of Electric stock and when Kratz and Stock came into his office and Kratz said, "Here is Mr. Stock *to take up those shares*," that Meysenburg would make no inquiry as to *what shares* Kratz alluded to, and no proposition to sell them to Stock; set no price for which he would sell the shares, but go at once to his safe or desk, bring out the shares and his memorandum and hand them to Stock and take from the latter a check for $9,000 payable to his (Meysenburg's) order. It would require too much credulity to believe for a moment that this pantomimic performance was based upon a mere presentiment on each side that Stock, at that particular time, would walk into Meysenburg's office with the check in his pocket for the exact amount Meysenburg would require for his shares and that Meysenburg would have the shares ready to deliver without any actual bargaining between them. No jury or court is bound to believe any such utterly unreasonable thing as this. On the contrary, courts and juries alike would inevitably and necessarily find that, previous to this interview, through the agency and intervention of some third party, the subject-matter and the terms of this deal had all been definitely and expressly agreed upon, and only required that each should ratify and consummate it on his part, Meysenburg by delivering the par-

ticular shares, and Stock, by paying the agreed price, and no court or jury would hesitate to find that Kratz was the intermediary through whom the terms had been agreed upon.

But while this will probably be conceded by every one, it still falls short of the express agreement alleged in the indictment, to-wit, that this payment of $9,000 by Stock to Meysenburg was only the *pretended and ostensible* price of certain shares which were *unmarketable and worthless,* but in truth and fact was paid upon an express agreement that Meysenburg would oppose, resist, withstand, thwart and defeat the passage of said ordinance, unless and until he was paid said sum of $9,000. Obviously counsel for the State do not insist that they established an express agreement of this kind. But they assert that they did establish an agreement that in consideration of the receipt of $9,000 Meysenburg would cease to resist, oppose and defeat said ordinance, and that such is the meaning of the indictment. Whatever the intention of the pleader, we are clear the indictment did not so charge. As a new indictment may be preferred or information filed, charging the express agreement which counsel urge the present indictment does charge, but which we hold it does not, we forbear discussion of its weight or probative force, further than to say that the evidence of Wiggins, who was a member of the railroad committee of the Council with defendant Meysenburg, when the Suburban bill was before that committee, as to a conversation with Meysenburg to the effect that he had a claim against some of the parties behind the Suburban bill, which he had an opportunity to adjust while a member of the Council, and that when the Suburban bill was introduced they had intimated to him they would be glad to settle his account, and that about that time he had seen Kratz in Meysenburg's office, and that this witness warned him that it would be very indiscreet for him to compromise a claim of that kind while a member of the Council,

Vol 171, mo—3.

had a tendency to prove such agreement, and as Kratz was spokesman when the money was paid and the propositions he carried between the parties ratified by both, it was competent to prove that, upon information conveyed by him to Stock, Stock bought the check and went to Meysenburg's office. It was not competent to go into the $60,000 deal in which it is claimed Kratz and other members were to receive that sum, because Meysenburg was no party to it. It was not connected with this charge.

It was competent for the jury to consider the fact for what it is worth, that Meysenburg suggested and procured the amendment of the report of the committee, by adding the words, "Without recommendation," and that Stock told Meysenburg he regarded the stocks as worthless or of no value, clearly showing his purpose in the premises. It was entirely competent to show Stock's employment by Turner, the president of the Suburban, to lobby the ordinance through the Council; and the furnishing of the money by Turner to buy Meysenburg's stock. While this evidence would have been competent to prove the offense which the State conceived the indictment charged, it did not prove a charge which it actually made and which as made did not bring it within the statute upon which it was attempted to convict the defendant. Whether the shares were worthless and unmarketable was an issue tendered by the indictment, hence, proof of the value was both competent and material, as tending to show whether they constituted the true consideration for the $9,000 or were a mere pretense and sham. It was competent to show that Stock regarded them as worthless on his part, and it was equally open to Meysenburg under any charge impeaching the honesty of the transaction to show they were valuable. [3 Greenleaf, Ev. (14 Ed.), 873.]

This brings us to the question of the competency of the evidence offered by defendant to show the value of the shares. Mr. Judson, a member of the bar, was introduced to show that on the day before the transfer

of the shares to Stock by Meysenburg, the latter con-
sulted him as to his claim against the Kinloch syndi-
cate, some of the members of which were also Suburban
stockholders, for the purpose of showing, as stated by
counsel, that the Electric shares had a litigated value
at least. It was not proposed to show, neither would
it have been competent to have done so, that Mr. Jud-
son had advised him as a member of the Council, that
it was proper for him to exact of the stockholders and
officers of the Suburban company payment of this liti-
gated claim as the price of his vote or the cessation of
his opposition to the passage of the ordinance.

Whatever rights he had, if any, against the Kin-
loch syndicate could have been enforced in the courts,
but the advice of counsel would have been no defense
if he proposed to use them to extort payment as the
price of his ceasing resistance. It was the offer of a
self-serving statement in his own behalf and, therefore,
inadmissible. [State v. Holcomb, 86 Mo. 378.]

If Mr. Judson knew the market or real value of
the shares independently of any representation by de-
fendant to him, of course he was competent to state it.
Of course it was competent to show by competent evi-
dence that though the shares had no marketable value
as such, still they had, owing to the value of the assets
of the company, real value. This has long been estab-
lished in this court. [Trust Co. v. Lumber Co., 118
Mo. 447; Hewitt v. Steele, 118 Mo. 463.]

Defendant also offered to prove that in 1899, Mr.
Chas. B. Stark who had purchased 350 shares of stock
in the Electric company in 1895 sold it in the spring
of 1900 for $16,000, to the members of the Kinloch
syndicate. Asked the value of the stock, Mr. Stark
answered, he only knew by what he received for it.
The court then inquired of Judge Krum to know if
this was the transaction which he had outlined in his
opening address to the effect that Mr. Stark had com-
promised with the gentlemen composing the Kinloch
syndicate and it was in this way he had received what
he did for his shares, and counsel answered it was.

Thereupon the court excluded it. If the ruling of the court was predicated, as we think it clearly was, on the proposition that proof of what Stark, Brady or any other owner of Electric shares had obtained on a compromise, after threatened litigation from certain parties called the Kinloch syndicate, then we think it ruled correctly. While it has been decided by this court that where shares of stock have no market value in the open market it is competent to show their real value by proof of the assets of the company, or the dividend-yielding capacity of the shares, it has never yet been ruled that what one stockholder has been able to get for his shares in a threat of suit against the company or its directors could be made the measure of the value of the shares of another member.

While it is true, that the price of real estate may be shown by proof of sales of similar lands in the same neighborhood about the same time, it has never been ruled that what one owner received for his land as a compromise of litigation was competent to establish value. Too many considerations enter into the elements of a compromise to make one man's settlement the basis of another's. No proof was offered that, disconnected with any threatened litigation and about the same time, shares of Electric Construction stock were sold in that city. Such proof we think would have been competent but taking the statement of counsel of defendant to the court when the offer was made we think the offer was properly rejected.

We agree that the instructions numbered 8 and 11, asked by defendant, should have been given if they were not already given in substance. It was for the jury to find whether the transaction was an honest one or a mere cloak for a bribe. But the court's instructions numbered 5, 6, and 7 fully covered the law contended for in defendant's instructions 8 and 11 and, hence, no error was committed by refusing them.

As already indicated, as the indictment did not allege an agreement that Meysenburg would cease to resist and oppose the passage of the ordinance unless

and until he was paid $9,000, the proof did not support the indictment and did not allege an offense within the statute, and, hence, defendant's first instruction refused should have been given.

The evidence that the bill No. 44 was pending in the Council from October 9, 1900, to February 8, 1901, was competent to show the bill was pending at the time of the transaction between Meysenburg and Stock on February 2, 1901.

The State's third instruction was error because while it was immaterial what Meysenburg did after transferring the shares to Stock, the statute under which defendant was prosecuted required that the defendant should agree for a corrupt consideration to be more favorable to the bill or ordinance, or should omit to do his duty in an impartial manner. The statute makes the receipt of the bribe in pursuance of a corrupt agreement the gist of the offense and, hence, it could not be immaterial what his agreement was. The instruction is contradictory.

We agree that the prosecuting attorney should not have inquired as to the acquaintance of the jurors who were being examined on their *voir dire,* with other persons who were charged with bribery and illegal practices. The inquiry took too broad a scope.

As to the order of the court requiring defendant to sit apart from his counsel, all that appears in the record so far as we can discover is the following:

"Mr. Folk: This is the case of the State of Missouri v. Emil A. Meysenburg defendant. . . . This is the defendant."

"The Court: Take a seat there."

"Mr. Jourdan: We want him to sit here with counsel."

"The Court: Take a seat there."

There is nothing before us to indicate the place pointed out by the word "there."

No objection was made and no exception saved. Nothing to show that defendant was not accorded the

full benefit of counsel which every defendant under our Constitution and laws is guaranteed. Upon the record, which is all we can look to, we discover no ground for imputing a denial of defendant's rights in this respect.

In view of the insufficiency of the indictment in the matters pointed out, the judgment must be reversed and the cause remanded that the prosecuting attorney may refer the matter to another grand jury or file an information as he may be advised in the premises.

*Burgess, C. J.*, concurs in my view except that he thinks the court should have given instructions 8 and 11 asked by defendant.

### SEPARATE OPINION.

SHERWOOD, P. J.—1. Receiving a bribe was the charge in the indictment. Defendant, being tried, was convicted and his punishment assessed at imprisonment in the penitentiary for the term of three years.

Judgment went and sentence passed accordingly, from which he has appealed to this court, alleging numerous errors as having occurred in the trial court.

The indictment filed on February 1, 1902, omitting caption, reads this way:

"That on (or about) the thirtieth day of January, in the year one thousand, nine hundred and one, the said city of St. Louis was a municipal corporation in the State of Missouri aforesaid, and that the legislative power of the said city of St. Louis was by law vested in a Council and a House of Delegates, styled the Municipal Assembly of St. Louis, the members whereof were elected by the citizens of St. Louis.

"That at the said city of St. Louis, and on (or about) the said thirtieth day of January, one thousand, nine hundred and one, one Emil A. Meysenburg was a public officer of said city of St. Louis, to-wit, a member of the said Council and of the said Municipal Assembly of St. Louis, duly elected and qualified, and was then and there acting in the official capacity and

character of a member of said Council and of the said Municipal Assembly of St. Louis.

"That there was then and there pending and undetermined before the said Municipal Assembly for the consideration, opinion, judgment and decision of the members thereof in the said Council, and before the said Emil A. Meysenburg in his said official capacity and character, as a member of said Council and said Municipal Assembly of St. Louis, a certain measure, matter, cause and proceeding in the nature of a proposed ordinance of the said city of St. Louis (designated and known as Council Bill No. 44), wherein and whereby it was proposed that the said city of St. Louis (by ordinance duly passed and enacted by the said Municipal Assembly and approved by the mayor of said city) should grant certain valuable rights, privileges and franchises to the St. Louis and Suburban Railway Company (a railroad corporation), and to permit the said railway company (among other things), to lay its railroad tracks and run its railroad cars in, upon and over certain designated public streets and highways of said city of St. Louis.

"That it then and there became and was the public and official duty of the said Emil A. Meysenburg, as a member of said Council, and in his official capacity and character as aforesaid, to give his vote, opinion, judgment and decision upon the said measure, matter, cause and proceeding, and for or against the said proposed ordinance without partiality or favor."

a. "That he, the said Emil A. Meysenburg, well knowing the premises, but unlawfully and corruptly devising, contriving, scheming and intending to prostitute, betray and abuse his trust, and to violate his duty (as aforesaid) as a member of said Council and of the Municipal Assembly, did, at the said city of St. Louis and on (or about) the said thirtieth day of January, in the year one thousand, nine hundred and one, unlawfully, corruptly and feloniously—directly and indirectly —solicit, propose, procure, accept and receive a certain gift, consideration, gratuity and reward, under an

agreement that his opinion, judgment and decision, as a member of said Council in his official capacity and character as aforesaid, should and would be more favorable to the passage and enactment of said measure, matter, cause and proceeding, and to the said proposed ordinance of the said city of St. Louis, then and there (as aforesaid), pending and brought before the said Council and before him, the said Emil A. Meysenburg, as a member of said Council, and in his said official capacity and character, and under an agreement that he, the said Emil A. Meysenburg, would and should perform his said public and official duty in the premises with partiality and favor and otherwise than according to law.''

b. ''That he, the said Emil A. Meysenburg, did then and there unlawfully, corruptly and feloniously, solicit, propose, procure, make and enter into a certain corrupt bargain, agreement and covenant with one Philip Stock (who was then and there the agent and representative of the said St. Louis and Suburban Railway Company, its officers and members, and who was then and there acting for and in behalf of the said St. Louis and Suburban Railway Company, its officers and members, as he, the said Emil A. Meysenburg then and there well knew), by and under which said corrupt bargain, agreement and covenant a large sum of money, to-wit: the sum of nine thousand dollars, lawful money of the United States, was paid to him, the said Emil A. Meysenburg, by the said Philip Stock, as the pretended and ostensible price, consideration and value of certain worthless and unmarketable shares of stock of the St. Louis Electric Construction Company, then and there had and held by him, the said Emil A. Meysenburg, upon the express understanding and agreement between the said Emil A. Meysenburg and the said Philip Stock, that unless and until the said sum of nine thousand dollars was so paid by the said Philip Stock to the said Emil A. Meysenburg, as the said pretended and ostensible price, consideration and value of the said shares of stock, he, the said Emil

A. Meysenburg, as a member of said Council and in his said official capacity and character as aforesaid, would and should oppose, resist, withstand, thwart and defeat the passage and enactment of said measure, matter, cause and proceeding and of the said proposed ordinance, then and there as aforesaid pending and brought before the said Council and before him, the said Emil A. Meysenburg, in his said official capacity and character as a member of said Council.

"Contrary to the form of the statute in such case made and provided and against the peace and dignity of the State.

"W. Scott Hancock,

"Assistant Circuit Attorney."

The statute on which this prosecution had its origin is the following:

"Sec. 2084. Every person who shall, directly or indirectly, give any money, goods, right in action or any other valuable consideration, gratuity or reward, or any promise, undertaking or security therefor, to any judge or justice of any court, justice of the peace, or to any member of the Legislature, or to any officer or employee thereof, or to any other public officer of this State, or of any county or city, town or township thereof: First, with intent to influence his vote, opinion, judgment or decision on any question, matter, election, appointment, cause or proceeding, which may be then pending, or may by law be brought before him in his official capacity, or to induce him to neglect or omit the performance of any official duty, or to perform such duty with partiality or favor, or otherwise than is required by law; or, second, in consideration that any such officer or member of the Legislature has given any vote, opinion, judgment or decision in any particular manner, or for any particular person, or upon any particular side, or more favorable to one side than the other, in any matter, question, election, cause or proceeding, or has omitted to perform any official act or duty, or has performed such act or duty with partiality or favor, or in anywise contrary to law, shall

be deemed guilty of bribery, and be punished by imprisonment in the penitentiary for a term not exceeding seven years.

"Sec. 2085. Every judge or justice of any court, justice of the peace, member of the Legislature, or officer or employee thereof, and any other public officer of this State, or of any county or city, town or township thereof, who shall, directly or indirectly, accept or receive any gift, consideration, gratuity or reward, or any promise or undertaking to make the same: First, under any agreement that his vote, opinion, judgment or decision shall be given for any particular person, or in any particular manner, or upon any particular side, or more favorable to one side than the other, in any question, election, matter, cause or proceeding which may be pending or be brought before him in his official capacity, or that he shall neglect or omit to perform any official duty, or perform the same with partiality or favor, or otherwise than according to law; or, second, in consideration that he has given his vote, opinion, judgment or decision for any particular person, or in any particular manner, or upon any particular side, or more favorably to one side than the other, in any question, election, matter, cause or proceeding, or has neglected or omitted to perform any official act or duty, or performed such act or duty with partiality or favor, or in anywise contrary to law, shall be deemed guilty of bribery, and punished as prescribed in the next preceding section."

The indictment is bottomed on the latter section, inasmuch as that is the section which treats of and punishes the reception of a bribe by one in official station.

The particular portions of the indictment to which attention will now be directed have been respectively marked, as a convenient method of designation, "a" and "b."

Paragraph "a" is treated by the prosecution as a matter of *inducement* to what follows in the next succeeding paragraph.

But this position can scarcely be correct, because paragraph "a" states that defendant had accepted a certain gift under an agreement that his opinion, judgment and decision as, etc., should and would be more favorable to the enactment of said measure, etc., to said proposed ordinance, etc., and under an agreement that he would and should perform his official duty in the premises with partiality and favor and otherwise than according to law.

But paragraph "b" treats of a transaction where $9,000 was paid to defendant on his express agreement that until and unless the said sum was paid him, he as a member, etc., would and should "oppose, resist, withstand, thwart and defeat the passage and enactment of said measure," etc., of said proposed ordinance.

Assuredly, paragraph "a" can not be regarded as matter of inducement for paragraph "b," since the first states that defendant, on the delivery to him of a certain gift, there agreed to be favorable to the passage of ordinance 44, while paragraph "b" shows that until and unless the $9,000 were paid him, that was then paid him, he would oppose, resist, etc., the passage of said ordinance 44. In the one case, favorable action, in the other unfavorable, unless on payment made, which was made. It is needless, however, further to discuss this matter, because paragraph "b" is the one on which defendant was tried, and the only one, therefore, whose sufficiency need be examined.

At common law, as defined by Bishop, "Bribery is the voluntary giving or receiving of anything of value in corrupt payment for an official act, done or to be done." [2 Bishop's New Cr. Law (8 Ed.), sec. 85.]

Our statute in the sections already quoted has, however, effected such change in the common-law offense of bribery as to divide the crime into two divisions, so that bribery consists, under our statute, in giving anything of value in corrupt payment for an official act, etc.; while the other division, as contained and defined in section 2085, consists in the acceptance or receipt of any bribe. So that under our statute, we

have two distinct offenses plainly marked out, one for *giving*, the other for *receiving*, a bribe; but both are termed bribery. And "Wherever a general statute, purporting to be exhaustive, is passed on a particular topic, it absorbs and vacates on that topic the common law." [Whart., Crim. Plead. and Prac. (9 Ed.), sec. 234, and cas. cit.]

This being the case, we must look to that statute, to-wit, section 2085, in order to determine the sufficiency of the questioned indictment. In many cases, it will be sufficient if the indictment follows the statute, but this rule only applies where *all* the facts which constitute the offense are set forth in the statute. [State v. Kesslering, 12 Mo. 565; State v. Davis, 70 Mo. 467.]

SHAW, C. J., in Tully v. Commonwealth, 4 Met. l. c. 358, observes: "When the statute punishes an offense, by its legal designation, without enumerating the acts which constitute it, then it is necessary to use the terms which technically charge the offense named at common law. But we think this is not necessary, when the statute describes the whole offense, and the indictment charges the crime in the words of the statute." Mr. Wharton, treating of this subject, says: "On the general principles of common-law pleading, it may be said that it is sufficient to frame the indictment in the words of the statute, in all cases where the statute so far individuates the offense that the offender has proper notice, from the mere adoption of the statutory terms, what the offense he is to be tried for really is. But in no other case is it sufficient to follow the words of the statute. It is no more allowable, under a statutory charge, to put the defendant on trial without specification of the offense, than it would be under a common-law charge." [Whart., Cr. Pl. and Prac. (9 Ed.), sec. 220; to the same effect see Heard on Crim. Pl., 161, 162, 163, 165, 166; Stener v. State, 17 The Reporter 670; State v. Gardner, 28 Mo. 90; State v. Rochforde, 52 Mo. 199; United States v. Carll, 105 U. S. 611; United States

State v. Meysenburg.

v. Cruikshank, 92 U. S. 542; 1 Arch. Cr. Pr. and Pl., 88; 2 Hawk., P. C., ch. 25, sec. 111.]

Mr. Bishop, in his admirable treatise, says: "The doctrine of the courts is identical with that of reason; namely, that the indictment must contain an allegation of every fact which is legally essential to the punishment to be inflicted. This doctrine pervades the entire adjudged law of criminal procedure. It is made apparent to our understandings, not by a single case only, but by all the cases. Wherever we move in this department of our jurisprudence, we come in contact with it. We can no more escape from it than from the atmosphere which surrounds us." [1 Bishop, Crim. Proc., sec. 81.] And elsewhere the learned author observes: "The right of the accused person to have every element of his supposed crime—in other words, every individual thing which the law has specified as constituting any part of the foundation for its punishment—set down in allegation in the indictment is secured in this country by constitutional guaranties." "The United States Constitution provides, as to crimes against the general government, that 'in all criminal prosecutions the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation.' More or less nearly in these words are provisions in the Constitutions of other States. But the 'nature and cause' of an accusation are not stated where there is no mention of the full act or series of acts for which the punishment is to be inflicted. . . . There can be neither indictment nor information except in writing; which, to justify the whole punishment, must specify the whole crime." "Wisely, therefore, the law requires the allegation to be full. As already shown, every fact which is an element in a prima facie case of guilt must be stated; otherwise there will be at least one thing which the accused person is entitled to know, whereof he is not informed. And that he may be certain which each thing is, each must be charged expressly, and nothing left to intendment. All that is to be proved must be alleged." [Ib., secs. 86, 88, 519.]

On this point PORTER, J., in Mears v. Commonwealth, 2 Grant (Pa.) 385, expresses his views very happily, saying: "In the spirit of that principle which presumes innocence until guilt be established, we infer that what is not charged in an indictment does not exist, and it is the business of the pleader to exclude, by proper averments, the conclusions to which the accused is thus entitled."

Archbold says: "The indictment must state all the facts and circumstances comprised in the definition of the offense, by the rule of the common law or statute on which the indictment is founded. And these must be stated with clearness and certainty; otherwise, the indictment will be bad. The principal rule as to the certainty required in an indictment, may, I think, be correctly laid down thus: that where the definition of an offense, whether by a rule of common law or by statute, includes generic terms (as it necessarily must) it is not sufficient that the indictment should charge the offense in the same generic terms as in the definition, but it must state the species—it must descend to particulars." [1 Arch., Crim. Proc. 88.] "Certainty may be defined to be a clear and distinct setting down of facts, so that they may be understood both by the party who is to answer the matters stated against him, the counsel who are to argue them, the jury who are to decide upon their existence, and the court who are the judges of the law arising out of them." [Rex. v. Griffith, 3 Mod. 201; Lawes' Pl. 53.] In United States v. Cruikshank, 92 U. S. 542, an indictment had been drawn which "followed the language of the statute," and it was held bad, WAITE, C. J., stating: "In criminal cases, prosecuted under the laws of the United States, the accused has the constitutional right 'to be informed of the nature and cause of the accusation.' [Amend. 6.] In United States v. Mills, 7 Pet. 142, this was construed to mean that the indictment must set forth the offense 'with clearness and all necessary certainty, to apprise the accused of the crime with which he stands charged;' and in United States v. Cook, 17

Wall. 174, 'that every ingredient of which the offense is composed, must be accurately and clearly alleged.' . . . For this, facts are to be stated, not conclusions of law alone.'' Similar rulings have been made elsewhere respecting the necessity of certainty in the charges contained in indictments based upon statutes when viewed in the light of similar constitutional provisions. [Landringham v. State, 49 Ind. 186; McLaughlin v. State, 45 Id. 338; State v. Learned, 47 Me. 426; Murphy v. State, 24 Miss. 590.]

And acts of the Legislature whose purpose was to make a general allegation as to crimes charged in indictments sufficient were held unconstitutional because of impinging upon the constitutional right of the accused to know of what he is alleged to be guilty and to meet the exact charge against him.

Treating of the subject of legal conclusions being employed in an indictment an author already quoted remarks:

''The facts in allegation must be the primary and individualizing ones. Thus, a charge that the defendant committed larceny discloses only a secondary fact, produced by a combination of primary facts and law; in other words, it is a conclusion of the law. This does not suffice. The pleader should set out the primary facts, disconnected from the law; then the court, knowing the law and applying it to them, will deduce the legal result.'' [1 Bishop's New Crim. Proc. (4 Ed.), sec. 331.]

Elsewhere the same author observes: ''A statute having made it punishable for one not a 'qualified voter' to vote at an election, a charge of the offense simply in these words was adjudged inadequate. For whether or not the defendant is such voter is a deduction of the law from the facts; and though a statute may define an offense by its legal result, not so an indictment. It must state the facts whence the result comes; thus notifying the defendant of what he must meet, and putting upon the record a proper case for

the court's adjudication." [1 Bishop's New Crim. Proc. (4 Ed.), sec. 627.]

Numerous instances of similar nature and similar rulings thereon abound in the books. In an early case in this State, where the statutory words were: "maliciously and cruelly maim, beat, or torture any horse, ox, or other cattle," a charge of torturing was held to require an expansion by showing the means and their effect; so as, in the words of Ryland, J., to enable the courts to "see that such means have the inevitable and natural tendency to produce the effect in which the criminal charge consists." Hence, the specification in the indictment that the defendant tied brush or boards to the tail of a horse was inadequate; because this would not necessarily produce torture. [State v. Pugh, 15 Mo. 509.]

In the case before us, the statute of prosecution speaks of what would be criminal acts on the part of a number of official persons, to-wit: a judge or justice of any court, justice of the peace, member of the Legislature, or officer or employee thereof, and any other public officer of this State, or of any county or city, town or township thereof, who shall receive a bribe, etc.

It would seem that so far as concerns a member of a legislative body, the corrupt agreement must be:

1. That the vote will be given for some particular person, or

2. That the vote will be given in some particular manner, or

3. That the vote will be given upon some particular side, or

4. That the action will be more favorable to one side than to the other, or

5. That the legislator will neglect or omit to perform some official duty, or

6. That he will perform the same with partiality or favor or otherwise than according to law.

But the indictment here does not proceed in this manner; it does not follow the statute either in a general or in a specific way, and if the words "oppose,

resist, withstand, thwart and defeat" can be regarded as the proper words to use, still unless the indictment had specified *how* or in *what way* and *manner* defendant agreed he would oppose, resist, etc., the use of those words would be the mere statement of a legal conclusion and, therefore, wholly insufficient and inadequate, as stated in the foregoing authorities.

In the somewhat recent case of State v. Burke et al., 151 Mo. 136, the indictment alleged that bets were made "upon the result of certain trials of contests of skill, speed and power of endurance of man and beast," but no statement was made as to *what* those trials were and in what they consisted, and the indictment was held to be ill on that account, and this because defendants had a right to know these things in order to prepare for their defense, and in order, in case of conviction or acquittal, to properly frame a plea in bar of further prosecution.

On this same subject of the utter insufficiency and uncertainty of mere legal conclusions in an indictment, this court, in another case, made a ruling and cited and quoted several authorities, saying among other things: "Certainty may be defined to be clear and distinct setting down of facts, so that they may be understood both by the party who is to answer the matters stated against him, the counsel who are to argue them, the jury who are to decide upon their existence, and the court who are the judges of the law arising out of them. [King v. Griffith, 3 Mod. 201.]

"In the case at bar, the facts which constituted the lien and incumbrance on the horses are not so stated as to notify the defendant and apprise him of what he was to meet at the trial. [State v. Trisler, 31 N. E. 881, and cas. cit.]

"The allegation in regard to the lien and incumbrance really amounts to no more than an *untraversable legal conclusion, the mere inference of the pleader; but facts* should have been alleged in order to enable

Vol 171, mo—4.

the court to determine whether the mortgage was a valid lien.

"In Lamberton v. State, 11 Ohio 282, the indictment set forth, that the plaintiff in error, 'on, etc., at etc., with force and arms, one David Bryte, then and there being sheriff of said county, and, also, then and there being in the execution of his said office, as such sheriff as aforesaid, unlawfully did resist, contrary to the form of the statute,' etc. And the indictment was held bad on the ground that 'it merely states a conclusion of law predicated on a supposed state of facts.'" [State v. Stowe, 132 Mo. loc. cit. 207.]

In concluding this paragraph of the opinion, it may not be amiss to say that the clause of the indictment just considered would seem more closely to resemble a black-mailing scheme than the acceptance of a bribe.

And it appears passing strange that the "legislative agent," the promoter of the proposed ordinance, should make an express agreement with defendant that the latter should "oppose, resist," etc., the pending ordinance until and unless the sum of money should be paid him, and then immediately paid it. In other words, the promoter of the enterprise expressly agreed with defendant that the latter should oppose such enterprise, and then immediately paid him $9,000 to instantly refrain from such opposition, thus contemporaneously bargained for.

In short, the promoter expressly agreed with defendant for his opposition to the ordinance, and then immediately paid him before such opposition could possibly begin. Such transaction closely resembles a child's play of cross purposes.

Taking the allegations of the indictment as true, there was nothing that defendant had done or could do in consideration of the bribe received. And there is no averment in the indictment that defendant had done any act in the past or promised to do any act in the future, in consideration of what he had received. [State v. Saunders, 63 Mo. 482; State v. Phelan, 159 Mo. 122.]

How, then, do defendant's alleged acts amount to bribery either at common law or to accepting a bribe under our statute? Plainly, they do not.

And it may be further remarked in this connection, that the statement in the indictment that the $9,000 was "the pretended and ostensible price, consideration and value of certain worthless and unmarketable shares of stock," etc., was a *mere matter of evidence,* and had no business or place among the allegations of an indictment.

2.  Nor was it at all necessary, as has been urged by the prosecution, for defendant to raise the point of the insufficiency of the indictment either by motion to quash, demurrer, or motion in arrest, since such insufficiency being matter of record, can be raised by mere writ of error. This was the rule at common law. [Rex v. Osmer, 5 East 304; Rex v. Everett, 8 B. & C. 114; Rex v. Norton, 8 C. & P. 196; Rex v. Jackson, 1 Leach 303. See also State v. Hagan, 164 Mo. loc. cit. 659.]

And in this State it has been the rule ever since the case of McGee v. State, 8 Mo. 495, that wherever a defect in an indictment is available on motion in arrest, it is equally available in this court on appeal or error, and that this court of its own motion will raise the point. [State v. Meyers, 99 Mo. loc. cit. 112, and many sub. cas.] And in determining the sufficiency of an indictment based on a criminal statute, the rule of law is axiomatic that the language of such statute must be strictly construed in favor of the defendant (United States v. Rapp, 30 Fed. 818), and no person can be brought within the penalties of such statute unless the indictment, by proper averments, makes out a prima facie case, by bringing him within both the letter and spirit or meaning of such statute. [Bishop, Stat. Crim. (2 Ed.), sec. 230; Ib., sec. 227.]

3.  But even if the indictment could be held sufficient, still the judgment could not be affirmed for the reason that a fatal variance exists between the allegation in the indictment that "the sum of nine thousand dollars lawful money of the United States," was paid

defendant, while the testimony offered in support of
such allegation, clearly shows that such amount was
not paid in *money,* but in lieu thereof a *check* was given
for the amount. This constituted no evidence, what-
ever, to support the charge. [Bishop, Stat. Crim., secs.
328, 346.]

Numerous precedents announce and illustrate this
familiar rule and fundamental principle of evidence.
Thus it has been held that under an allegation "of the
lawful money of the United States," evidence that notes
to the same amount issued by a national bank was not
sufficient to support the charge. [Hamilton v. State,
60 Ind. 193.]

So where the averment was that the defendant said
he had paid a sum into the bank, but the proof was that
he said the money had been paid, not stating by whom,
the defendant was acquitted for the variance; Lord
ELLENBOROUGH holding that the assertions were differ-
ent in substance. [Rex v. Plestow, 1 Camp. 494.]

In State v. Dodson, 72 Mo. 283, where Dodson was
indicted for the embezzlement of *horses,* this court
held that any evidence to show that he had embezzled
the *proceeds* of the sale of such horses, after selling
them, was wholly inadmissible and any instructions
based thereon incurably erroneous. Similar instances
are found in the books in great numbers, and some of
them are cited in the brief of counsel for defendant.

4. But further on the subject of the wide dis-
crepancy between the *allegata* of the indictment and the
*probata* offered in support of the charge. The indict-
ment at bar alleges an *"express understanding and
agreement* between the said Emil A. Meysenburg and
the said Philip Stock." It was quite unnecessary to
allege an express agreement between defendant and
Stock, but being alleged it became descriptive of the
offense and had to be proved as laid; this is the inflex-
ible and universal rule as shown by all the authorities
and as understood by all lawyers.

Says Bishop: "If a necessary allegation is made
unnecessarily minute in description, the proof must

satisfy the descriptive as well as main part, since the one is essential to the identity of the other." [1 New Crim. Proc. (4 Ed.), sec. 485; Ib., sec. 486.] A great number of cases furnish apt illustration of this fundamental principle. Thus, in State v. Johnston, 6 Jones L. (N. C.) 485, it was held that though in an indictment under a statute for trading with a slave it was unnecessary to set forth the name of the owner of the slave, yet that if so set forth, it must be proved as laid. So, in John (a slave) v. State, 24 Miss. 569, a statute of that State provided that: "It shall not hereafter be necessary to allege in the indictment the name of the owner of any slave guilty of any crime punishable by the laws of this State with death." And upon this statute it was ruled that though the statute mentioned dispensed with the proof of the ownership in the slave, and the offense was complete when it was shown that a human being was feloniously killed by another human being; but the indictment having alleged ownership, it became an indispensable prerequisite of conviction that such ownership be proved. In State v. Copp, 15 N. H. 212, the indictment charged the defendant with resisting a deputy sheriff in the discharge of his duty, an averment that the sheriff was "legally appointed and duly qualified," having been needlessly injected into the indictment was held to be descriptive and consequently must be proved. In Commonwealth v. Luscomb, 130 Mass. 42, the indictment charged the defendant with having in his possession, with intent to sell, "one pint of adulterated milk, to which milk water had been added," it was held that the government must prove that water had been added to milk *already adulterated,* and that proof of the addition of *water only* to the milk would not support the indictment. An indictment for stopping the mail unnecessarily alleged a contract between the post-master-general and the mail carrier, and was held not to be supported without proof of such contract. [United States v. Porter, 3 Day 283.]

And though mere surplusage may be rejected, stricken out or disregarded, yet this is not the case

when it is connected with the offense charged.    [3 Rice, Crim. Evid., 168, and cas. cit.]    Wharton says:    "Essential allegations, however, can not be rejected as surplusage.   .   .   .   An allegation in an indictment which describes, defines, qualifies, or limits a matter material to be charged, is a descriptive averment, and must be proved as laid, even though such particular description was unnecessary."    [Crim. Ev.  (9 Ed.), secs. 143, 146.]

The rule is that if after rejecting the redundant allegations enough be left to constitute the offense charged, this suffices, provided that which is alleged, but not proved, be neither essential to the charge nor describe or limit that which is essential.    [1 Chit. Crim. Law, 250; State v. Meyers, 99 Mo. 107.]

"A needless adjective, prefixed to an essential noun, being descriptive of what can not be rejected, must be proved also; as, if the indictment is for malicious mischief to 'white-oak' trees, or for larceny of a horse described by its sex or color or brand, these particulars of the things, wholly unnecessary to be stated, must be proved, or the variance will be fatal.· So, an indictment for libel need only allege a day of publication, and the proof may be either of the same or any other day; yet if it adds the date of the newspaper containing it, such date must be proved as laid.    So, money and bank notes in larceny or any other offense relating thereto, do not ordinarily require any very particular description; yet if the allegation is made needlessly minute, as, that they were of the 'lawful,' or of the 'current' money of the United States, the proofs must cover this superfluous part with the rest.    Again, though an indictment for the non-repair of a way need not state its *termini*; if it does they must be proved as. laid.· And it is the same of the *termini* of a post-route over which was to be carried. a letter alleged to have been stolen by the defendant.    So, if needlessly the mortgage, in an indictment for forging it, is described as 'recorded,' this identifying part must be covered by the proof.    [1 Bishop, New Crim. Proc., sec. 486.]

"Thus, though the name of the bank issuing a bank bill need not be alleged, if it is, it must be proved as laid." [2 Bishop, New Crim. Proc., sec. 738.]

In the present instance, "*an express agreement*" being alleged, testimony touching an implied or inferential one was out of the question, and wholly inadmissible.

The same rule as to the strictness of proof in support of certain needlessly minute allegations prevails even in pleadings in *civil* actions. Thus Greenleaf: "No allegation, descriptive of the identity of that which is legally essential to the claim or charge, can ever be rejected. . . . In justifying the taking of cattle damage feasant, because it was upon the close of the defendant, the allegation of a general freehold title is sufficient; but if the party states, that he was seized of the close in fee, and it be traversed, the precise estate, which he has set forth, becomes an essentially descriptive allegation, and must be proved as alleged. In this case the essential and non-essential parts of the statement are so connected as to be incapable of separation, and, therefore, both are alike material. . . . Nor is it material whether the action be founded in contract or tort; for in either case, if a contract be set forth, every allegation is descriptive. Thus, in an action on the case for deceit in the sale of lambs by two defendants, jointly, proof of sale and warranty by one only, as his separate property, was held to be a fatal variance. So also, if the contract described be absolute, but the contract proved be conditional, or in the alternative, it is fatal. The consideration is equally descriptive and material, and must be strictly proved as alleged." [1 Greenl., Evid. (15 Ed.), secs. 56, 58.]

And under this view it has frequently been determined in this State, in mere civil actions, that the allegation in a petition of an *express contract* or *warranty* can not be established or supported by proof of an implied contract or warranty. [Huston v. Tyler, 140 Mo. 252, and cas. cit.; Newland Hotel Co. v. Furniture Co., 73 Mo. App. 135; Cole v. Armour, 154 Mo. l. c. 350.]

If the observance of such strictness of proof be the undeviating rule in ordinary civil actions, then assuredly, and by the stronger reason, no less strictness can be permitted or tolerated in a criminal prosecution.

5.   On the subject of proving the express agreement as laid, the trial judge made a distinction between the concurrence of the *wills* of two persons, and the concurrence of their *minds*, and in the endeavor to give this distinction elucidation, made this deliverance: ''It is not necessary to an agreement, that the *wills* concur if the *minds* concur.  If I meet a highwayman and he presents a pistol and says if I do not surrender my valuables he will kill.  If you paid under that agreement, it is an agreement of the mind.''   Such a distinction as this which separates the *mind* from the *lever* which moves it, to-wit, the *will*, has never before appeared in print.   If the idea above set forth be correct, the doctrine of *duress*, as laid down in the books, should no longer be accepted as an accurate statement of the law, and a new dictionary and definition should be made, formulated and promulged as to the meaning of *aggregatio mentium.*

And the singular views of the trial court as to what an ''express agreement'' means are further contained in this instruction to the jury, given over objection and exception of defendant: ''Second.  By the terms 'express understanding and agreement' as used in the indictment, and in these instructions, is meant the concurrence of the minds of two persons upon the same proposition which has heretofore been set out by one or both of said parties in words or by conventional signs of a defined meaning.  And an express understanding and agreement made between two persons through the instrumentality, in whole or in part of a third person, amounts to the same thing.''

But there was no evidence whatever as to any such words or conventional signs of a defined meaning or of any other kind.  So that the instruction, aside from its conspicuous vagueness, had no foundation in evidence

on which to rest, and besides assumed that some such conventional signs of a defined meaning had passed between the parties. The whole evidence on this' point as to the interview between Stock and defendant is in these words: ''I telephoned Mr. Meysenburg, on February 2, in the morning, that I would like to meet him between ten and eleven and the answer came back that he would be in. Mr. Kratz and I went over to Mr. Meysenburg's and Mr. Kratz said: 'Mr. Stock is here to settle for those shares.' I then stated that I understood our people had not treated him properly and I wanted to show we do by paying the amount asked, although the shares were of no value. He then turned to Mr. Kratz and said: 'Charlie, you know very well I do not want anything but what is fair and square, I merely want the money which I laid out.' He then handed me a statement and these shares, stating he had expended so much money. I did not look at the statement at all, and handed him over the check, and he in return gave me the balance between the statement and the check, which was about $33.42, I believe; he gave me that in currency. I think I was about leaving when Mr. Meysenburg said to me: 'Now, Mr. Stock, I want you to strictly understand that this is a strict business proposition and that it will not influence my vote respecting the Suburban' bill.' Then I left with Mr. Kratz.'' The witness stated that this was all that occurred. He stated, also, that he never had a conversation with Meysenburg before this with reference to paying him $9,000, or getting this stock. Kratz did not testify, nor was he called as a witness by the State. There is nothing in this testimony to show any act of criminality on the part of defendant. The establishment of inferences, however strong, or probabilities, however great, will not warrant a conviction. The doctrine of chance does not apply here. [Ogletree v. State, 28 Ala. 693; Com. v. McKie, 1 Gray 61; see also State v. Shelley, 166 Mo. 616.]

Greenleaf says: ''A distinction is to be noted between civil and criminal cases, in respect to the degree

or quantity of evidence necessary to justify the jury in finding their verdict for the government. In civil cases, their duty is to weigh the evidence carefully, and to find for the party in whose favor the evidence preponderates, although .it be not free from reasonable doubt. But, in criminal trials, the party accused is entitled to the benefit of the legal presumption in favor of innocence, which in doubtful cases is always sufficient to turn the scale in his favor. It is, therefore, a rule of criminal law, that the guilt of the accused must be fully proved. Neither a mere preponderance of evidence, nor any weight of preponderant evidence, is sufficient for the purpose, unless it generate full belief of the fact, to the exclusion of all reasonable doubt. . . . It is elsewhere said, that the persuasion of guilt ought to amount to a moral certainty, or 'such a moral certainty as convinces the minds of the tribunal as reasonable men, beyond all reasonable doubt.' And this degree of conviction ought to be produced when the facts proved coincide with and are legally sufficient to establish the truth of the hypothesis assumed, namely, the guilt of the party accused, and are inconsistent with any other hypothesis. For it is not enough that the evidence goes to show his guilt; it must be inconsistent with the reasonable supposition of his innocence." [3 Grlf. Ev. (16 Ed.), sec. 29.]

It would be simply a farce to hold that such evidence would authorize a conviction. Not only is there no express agreement proven as alleged, but no implied. agreement; and without such express agreement the State's case fails, and it would equally have failed had an implied agreement been alleged, or relied on. Even in *civil* actions this court has constantly "acted on the principle of giving the defendants the benefit of a construction favorable to the honesty of the transactions, when that construction would as well consist with the circumstances as a contrary one, and that where doubts are entertained as to the true construction to be given to the conduct of the parties, those doubts should be resolved in favor of the defendants."

[Dallam v. Renshaw, 26 Mo. 1. c. 544.] This rule has frequently been followed in this court. [Bank v. Worthington, 145 Mo. loc. cit. 100, and cas. cit.; Gruner v. Scholz, 154 Mo. loc. cit. 424.]

If such favorable presumptions are indulged in favor of honesty where the charge is merely *fraud,* then *a fortiori* should a like but more favorable view be taken where *felony* is the charge, and the accused is clothed with the presumption of innocence unless destroyed and swept away by the countervailing evidence which establishes his guilt beyond a reasonable doubt. To the like effect see State v. Gritzner, 134 Mo. loc. cit. 525.

For these reasons defendant's demurrer to the evidence and as embodied in an instruction to that effect should have prevailed. [State v. Nesenhener, 164 Mo. 461; State v. Hagan, Ib. 654; State v. Baker, 144 Mo. 330; State v. Shackleford, 148 Mo. 493; State v. Gritzner, 134 Mo. 512.]

6. Nor is the conclusion just announced in any manner affected by the so-called testimony as to conferences, interviews and conversations between Stock, the "legislative agent," and Kratz, or between either of the others and Turner with reference to the purchase of defendant's shares of stock, defendant not being present or represented at such conferences, etc.; and the like line of remark applies to a conversation between Hospes and Stock. Such conversations were hearsay, pure and simple. [State v. Patrick, 107 Mo. loc. cit. 152; State v. Rothchild, 68 Mo. 52; State v. Jaeger, 66 Mo. 173; State v. Huff, 161 Mo. loc. cit. 488; State v. Hathhorn, 166 Mo. 229; State v. Foley, 130 Mo. 488; State v. Levy, 168 Mo. 521.] All these conversations, absent defendant, were indubitably *res inter alios.*

7. Nor was the cause of the State at all strengthened by assuming and advancing the position that defendant was the *co-conspirator* of Stock and Kratz. There was no evidence to show such conspiracy, or authority on the part of either Kratz or Stock to speak for

or act for defendant in the premises.   Consequently
State v. Huff, 161 Mo. loc. cit. 488, and other similar
authorities, heretofore cited, apply and condemn the
admission in evidence against defendant of such con-
versations.   Besides the idea that defendant conspir-
ed with Kratz and Stock to have *himself bribed,* is as
flagrantly absurd as would be the position that a wom-
an had conspired with others *for her own seduction.*

    8.   Whether the shares of stock sold by defendant
to Stock were valuable or worthless was a question,
under proper allegations made in the indictment, en-
tirely legitimate for discussion before the jury upon
proper evidence offered.   Because if it were shown
that defendant , knowing the stock to be worthless, sold
it to Stock merely to disguise the real  nature of the
transaction, to-wit,  the acceptance of a bribe, this
would be entirely competent evidence.   [3 Glf. Evid.
(14 Ed.), sec. 73.]   But the trial court, while it per-
mitted Stock after he had testified concerning the val-
ue of the shares *"No, I do not know anything about it,"*
yet permitted him in the face of such testimony and
over the objection of defendant in reply to the insistent
questioning of the circuit attorney, to say *"I do not
know; I considered them of no value."*   This witness
was not testifying as an *expert,* and had twice avowed
his ignorance of the value of the shares, and yet was
permitted to testify as to what he ignorantly *"consid-
ered"* their value to be.   He might as well have been
asked if he knew the distance to the Dog Star Sirius,
and having twice replied in the negative, he might have
been required to answer what he *"considered"* the
distance to be.   No possible or imaginable distinction
can be taken between the hypothetical case and the
one at bar.   If Stock *did not know, he did not know,*
and that was the *ultima thule* of all legitimate inquiry.
But such testimony as to what Stock *"considered"*,
etc., was as worthless as the State in the indictment
alleged the shares of stock to be.   [State v. Gritzner,
134 Mo. loc. cit. 525, and cas. cit.]

9.  Notwithstanding the trial court admitted such evidence and other evidence to show the value or want of it of the stock when offered on behalf of the *State*, yet that court utterly refused to permit *defendant* to introduce evidence showing such stock had a value. For instance:  Defendant offered to prove that minority stockholders of the Construction company, of whom defendant was one, asserted that the stock had been rendered valueless by improper conduct of the directors and, hence, shares did have at least a litigated value. This was excluded.    Defendant offered to prove by Mr. F. N. Judson that defendant came to the witness on February 1, 1901, which was the day before the transaction between defendant and Stock, and consulted him and Judge Krum as attorneys with reference to his claim against the directors; that at this consultation the shares of stock were referred to as the basis of the defendant's claim, and that the defendant was advised that he had a valid claim and could enforce it by appropriate litigation, and that defendant was led to go to Judge Krum and Mr. Judson by the advice of Mr. Stark, who had successfully asserted a similar claim against the Construction company.  This was excluded.

Defendant offered to prove by Mr. Charles B. Stark, that on March 22, 1900, he sold to August Gehner and others, including Stock and Nolker, three hundred and thirty shares of the Construction company stock for the sum of $16,000.  These purchasers are directors of the company.  That Stark had become a director of the Construction company in 1899, examined and made copies of its books and records and thereupon asserted a claim, based on his rights as a shareholder against the syndicate, which was acknowledged by the purchase of his shares as aforesaid.  The evidence was excluded.

Defendant offered to prove that in 1898, one Ledlie paid to defendant $3,533.33 and received therefor one hundred shares, par value $10,000, of the stock of the Construction company.  Ledlie was chief engi-

neer of the Kinloch Telephone company, a company affiliated with the Construction company, and from his position was presumed to know something of their value, and his purchase showed he did not regard the shares as valueless. This was excluded.

W. F. Nolker was produced by the State for the sole purpose of showing the shares had no value. He testified that in February, 1901, the company had noth- but debts and had no money, and that its shares were worth nothing.. The witness on cross-examination was then asked by Judge Krum this question:

"Q. Did you have any connection with the purchase of the shares of stock of the St. Louis Electrical Construction Company which were bought by the Kinloch syndicate from Charles B. Stark?

"Counsel for the State objects to the question as immaterial; we are not going into Mr. Stark's claim; Mr. Stark is not on trial." ·

Objection sustained.

"Mr. Krum: I offer to prove, if the court please, that Mr. Charles B. Stark held three hundred and fifty shares of the stock of the St. Louis Electrical Construction Company for which he paid the sum of $15,000, and that that amount was paid him in consideration of the purchase of that stock from him by the members of the Kinloch syndicate, and that this witness was one of the parties to the transaction. We will show that was about two and a half to three years ago. Please make that read $18,000 instead of $15,000.

"Mr. Folk: That is totally immaterial. Mr. Stark was not a member of the Council; Mr. Stark is not on trial here; Mr. Stark did not .get any money from the Suburban; he did not hold up anybody, and there was no bill pending before Mr. Stark in his official capacity."

And the objection to this evidence was again held well taken. A more unsound, puerile and flimsy objection was never raised, insisted on, or sustained to such offered testimony. If it was *vital* to the State's case to show the stock *worthless*, then certainly vital

to defendant's case to show that it was *valuable*. That Stark was not a member of the Council; that he was not on trial; that he did not get any money from the Suburban; that he did not hold up anybody; that there was no bill pending before him in his official capacity, had nothing in the world to do with the salient and very pertinent fact that less than two years before defendant sold his stock, Stark had sold 350 shares of this same stock to the Kinloch syndicate, for $18,000, and yet this offered testimony was incontinently excluded. It is entirely competent where no market value of shares of stock can be established by the prices current, to resort to other modes of proof, for instance, by individual sales of stock when made not under compulsion. This was so ruled in Trust Co. v. Lumber Co., 118 Mo. loc. cit. 461, and cas. cit.

Cognate rulings have been made by this court on the subject of the *sales of land*. Thus it has been held that evidence of sales of similar lands in the neighborhood was evidence of the value of land where damages were to be assessed in a condemnation proceeding. [Railroad v. Clark, 121 Mo. 169; Markowitz v. Kansas City, 125 Mo. 485]

Besides, Stock himself testified (on behalf of the State, however) that shortly before the transaction between defendant and himself, Hugh Brady had sold his shares of stock in the same company for $10 per share. Not only was competent evidence rejected when offered by defendant, as to the value of such stock, but the trial court refused to give for defendant these instructions.

"8. If the jury find and believe from the evidence that the defendant was the owner of the two hundred shares of stock of the St. Louis Electrical Construction Company, or that he held the same under the agreement offered in evidence between himself and Sutter and Kobusch, and that Philip Stock came to his office on the second day of February and offered him the sum of nine thousand dollars for the same, then the defendant had a right, notwithstanding he was a mem-

ber of the city Council; to sell and deliver said stock to the witness Stock, and receive from him the check for nine thousand dollars.''

"11.    If the jury believe from the evidence that the defendant had reasonable ground for believing and did believe that the stock which he delivered to Philip Stock was of the value which he demanded and received for it, and that he made the demand and received the same under an honest belief that he was entitled to obtain such sum, he is not guilty of any corrupt purpose in receiving the said sum from Stock, and your verdict must be not guilty.''

Although defendant vainly offered to show the stock was valuable, yet there was sufficient evidence in Stock's statement on which to bottom such or similar instructions, and if the instructions as asked were not correct, it was the duty of the trial court to give those which were correct.    [State v. Clark, 147 Mo. loc. cit. 38 and cas. cit.]

And not only was Stock's testimony sufficient on which to base such instructions, but the presumption of defendant's innocence was an important factor on which to base an instruction that in the absence of countervailing evidence, the sale to Stock would be presumed an honest one.

10.    It was perfectly competent to introduce evidence showing that Judge Krum and F. N. Judson were consulted by defendant as to the validity of his claim, on the day prior to his sale of shares to Stock, and advised him his claim was valid.    This testimony could not, in the circumstances set forth, be designated as *self-serving*.    It was legitimate evidence in tending to show the *quo animo* of defendant and his bona fides in seeking the advice of those able to advise him on the subject on which he sought information.

11.    There was nothing in the mere fact that the bill was pending from October 9, 1900, to February 8, 1901, to show defendant was obstructing the passage of the bill; in and of itself it proves nothing, and

should not have been admitted in evidence. Indeed, the evidence of competent and disinterested witnesses showed beyond doubt that the bill was not "held up," at all, and that defendant was in no way responsible for the delay in its passage.

12. The third instruction given for the State was the following:

"Third. If you believe and find from the evidence that the defendant accepted and received the said sum of money under the circumstances and upon such an agreement as above set forth, it is wholly immaterial whether or not defendant made any agreement as to what he should or would do after receiving such money."

This instruction is in direct conflict with the statute, in that section 2085 requires first, that the legislator for a corrupt consideration agrees to do something in the future contrary to his official duty; or, second, receives such corrupt gratuity in consideration that he has already done something in the past contrary to such official duty.

There was no such evidence on the part of the State that defendant had agreed to do anything in the future or had done anything in the past in consideration, etc., nor does the indictment contain any such allegation, and in an indictment nothing is to be taken by intendment or implication. [State v. Hagan, 164 Mo. loc. cit. 659.]

Here, the court in the first instruction told the jury an express agreement, as alleged in the indictment, was necessary to be proven, and then, in the instruction under review, told them *such an agreement was wholly immaterial.*

13. The trial court did not fully instruct the jury on all questions, etc.; an exception was duly saved to this failure; Stock was an accomplice, at least he was so asserted to be by the State and so treated by the court. and, if so regarded, an instruction as to the great caution with which his testimony should be received should

Vol 171, mo—5.

have been given the jury.    [State v. Donnelly, 130 Mo. loc. cit. 649, 650.]    His testimony was either worthless and should not have been admitted, or else it showed him a self-confessed bribe-giver, and the jury should have been properly cautioned.    But while the trial court was very particular about cautioning the jury about receiving *defendant's* testimony, it uttered no word, nor even gave a *"conventional sign"* of caution to the jury about *Stock's* testimony.

14.    It was wholly unprecedented and at war with familiar principles for the court to permit the circuit attorney to ask the panel of prospective jurors if they were acquainted with certain noted bribe-givers and takers, naming them, all of whom were then under indictment in the same court.    This was evidently done, in order by an *indirection* to do what could not have been *directly* done; to intimate to the jurors that defendant was a bird of the same feather, and thus in advance prejudice the panel against him.    The trial court of its own motion should have severely rebuked this reprehensible conduct.

15.    The trial court should not, by its order, have segregated defendant from his counsel and set him apart from them, thereby making it inconvenient for them to consult with him as occasion should require. Such an order is without precedent.    But inasmuch as no objection was made or exception saved to this order at the time when made, no advantage can be taken here of its being erroneous.

16.    This record abounds at every turn with errors committed; but none of them, however, in favor of *defendant*.    It would fill a volume properly to note and comment upon them; it will not be attempted. Those already mentioned must be taken as *indices* of the rest.

But I will say this for the record at bar, that it occupies the bad preeminence of holding a larger number of errors than any other record in a criminal case

I ever before examined; and that if this record exhibits a sample of a fair trial, then let Justice hereafter be symbolized by something other than the blind goddess with sword and scales.

17.    Because of the fact that there is no evidence to support the verdict of guilty, the judgment should be reversed and defendant discharged.

*Burgess, J.,* concurs as marked in a memorandum herewith filed; *Gantt, J.,* expresses his views in a separate opinion.    We all agree that the judgment should be reversed and the cause remanded, and such is our order.

### CONCURRING MEMORANDUM.

BURGESS, J.—I concur in Judge SHERWOOD's opinion wherein it is ruled that the indictment is bad; that error was committed in permitting the prosecuting attorney to ask the jurors upon their *voir dire* if they were acquainted with certain persons then under indictment for bribery; that the court should have instructed the jury upon the theory that Stock was an accomplice; that the third instruction given on the part of the State is erroneous, and that instructions numbered 8 and 11 asked by defendant should have been given.

In all other respects, I agree to Judge GANTT's opinion.