### UNITED STATES v. ROBINSON et al. and five other cases.

(District Court, W. D. Oklahoma. June 11, 1920.)

Nos. 2158–2161, 2164, 2165.

1. **Conspiracy** ⊕═43 (5) —**Averments as to conspiracy cannot be aided by allegations as to overt acts.**

Regardless of whether the conspiracy requires the commission of an overt act to become criminal, averments as to formation of the conspiracy cannot be aided by allegation as to commission of an overt act, so as to charge an offense, but the conspiracy must be sufficiently charged.

2. **Indictment and information** ⊕═110 (10) —**Indictment averring conspiracy to charge excessive price of sugar insufficient to state any offense.**

Assuming the validity of Food Control and District of Columbia Rents Act, Oct. 22, 1919, making it unlawful for any person to exact excessive prices for any necessity, or to aid or to abet doing of any act made unlawful, an indictment charging that defendants did conspire, combine, and agree, etc., that they would purchase and cause to be purchased large quantities of sugar, which is a necessity, and would exact and receive excessive prices therefor, is insufficient to state any offense, for, though the general terms of the act be sufficient, and "excessive" has well-defined meaning among lexicographers, the indictment itself must state the particulars charged, so as to give some basis showing that an excessive price was exacted; a charge in the general language of the statute being insufficient.

J. T. Robinson and another, Harry E. Alton and another, O. H. Dietz and another, Oscar D. Halsell and another, John D. Thomas

⊕═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

and another, and Charles E. Van Cleef and others were severally indicted for violation of the Food Control and District of Columbia Rents Act of October 22, 1919. On demurrers to indictments. Demurrers sustained.

Wilson, Tomerlin & Threlkeld, of Oklahoma City, Okl., for defendants Dietz and Morris.

P. C. Simons, of Enid, Okl., and Keaton, Wells & Johnston, of Oklahoma City, Okl., for defendants Alton and Smallwood.

Pierce & McClelland and E. E. Blake, all of Oklahoma City, Okl., for defendants Halsell and Crahan.

Cottinham & Hayes, of Oklahoma City, Okl., for defendants Thomas and Rucks.

Keaton, Wells & Johnston, of Oklahoma City, Okl., for defendants Van Cleef, Cooter, and Farnam.

POLLOCK, District Judge. The above entitled and numbered cases are each and all prosecutions by the government under the amendment of October 22, 1919, known as the Food Control and the District of Columbia Rents Act (chapter 80, 41 Stat. 297). To the indictments defendants, each and all, have demurred on similar grounds. These demurrers have been presented in oral argument, and now stand submitted for decision on voluminous briefs of counsel for respective parties. As the indictments and the demurrers thereto are so like or similar in nature, language, form, and legal intendment as to present in each case the same legal controversies, they may well be, and will be, ruled by this one memorandum.

The charge made against defendants, briefly stated, is that of a conspiracy to sell a named necessary food product at an excessive price. While in each case but one offense is charged, many overt acts are alleged to have been done in furtherance of the purpose of the illegal confederacy. The act charged to have been violated by defendants is of course a war measure, the force and effect of which will end and the act itself sink into desuetude when, if ever, the late war between this nation and the Central Powers of Europe shall have been formally declared at an end. In the course of this memorandum the fact that such formal declaration required to end the war in theory had not been made at the date the law was enacted, therefore at said time the fact this country still remained at war, will be conceded.

Again, the complete, absolute, and plenary power of Congress to enact any and all legislation by it deemed appropriate or necessary in time of actually existing warfare between this country and another or others to preserve its national life is also conceded. Hence the question here presented concerns itself more with the sufficiency of the facts pleaded in the foregoing indictments to charge against defendants a public offense under the settled principles and forms of criminal pleading than as to the constitutional right and power of the Congress to legislate on the subject of food control in the exercise of the war powers by Congress, to protect the country and feed and maintain its armies in time of war. Viewed in this light, it is evident the language

of the act itself must be first considered in connection with the charging part of the several indictments in a determination of the question presented.

[1, 2] The language of the act under which the indictments in these cases are found reads:

"It is hereby made unlawful for any person willfully to destroy any necessaries for the purpose of enhancing the price or restricting the supply thereof; knowingly to commit waste or willfully to permit preventable deterioration of any necessaries in or in connection with their production, manufacture, or distribution; to hoard, as defined in section 6 of this act, any necessaries; to monopolize or attempt to monopolize, either locally or generally, any necessaries; to engage in any discriminatory and unfair, or any deceptive or wasteful practice or device, or to make any unjust or unreasonable rate or charge in handling or dealing in or with any necessaries; to conspire, combine, agree, or arrange with any other person (a) to limit the facilities for transporting, producing, harvesting, manufacturing, supplying, storing, or dealing in any necessaries; (b) to restrict the supply of any necessaries; (c) to restrict distribution of any necessaries; (d) to prevent, limit, or lessen the manufacture or production of any necessaries in order to enhance the price thereof; or (e) to exact excessive prices for any necessaries, or to aid or abet the doing of any act made unlawful by this section. Any person violating any of the provisions of this section upon conviction thereof shall be fined not exceeding $5,000 or be imprisoned for not more than two years, or both: Provided, that this section shall not apply to any farmer, gardener, horticulturist, vineyardist, planter, ranchman, dairyman, stockman, or other agriculturist, with respect to the farm products produced or raised upon land owned, leased, or cultivated by him: Provided further, that nothing in this act shall be construed to forbid or make unlawful collective bargaining by any cooperative association or other association of farmers, dairymen, gardeners, or other producers of farm products with respect to the farm products produced or raised by its members upon land owned, leased, or cultivated by them." Section 2.

The charging part of the indictment in case No. 2158 (identical or similar in all of the other cases) reads:

"Defendants, then and there being, did then and there willfully, unlawfully, knowingly, and feloniously conspire, combine, agree, and arrange with each other, and with divers other persons to the grand jurors unknown, to commit an offense against the United States of America; that is to say, that each and all the aforementioned defendants unlawfully, willfully, knowingly, and feloniously did conspire, combine, agree, and arrange with each other, and with divers other persons to the grand jurors unknown, that they should and would, as the managing and active officers of Carroll, Brough & Robinson, a corporation, and as individuals, purchase and cause to be purchased large quantities of sugar, which commodity is a food used for consumption and is a necessary, from the Great Western Sugar Company, of Denver, Colorado, the Alton Mercantile Company, of Enid, Oklahoma, and the California & Hawaiian Sugar Refining Company, of San Francisco, California, and divers other sugar refineries, and divers wholesale dealers in sugar and brokers, whose names are to the grand jurors unknown, and that they should and would, when said sugar was so purchased by Carroll, Brough & Robinson, a corporation, by and through the said defendants, as the active officers in charge thereof, then and there unlawfully, willfully, knowingly, and feloniously demand, exact, and receive, and cause Carroll, Brough & Robinson, a corporation, to willfully, unlawfully, and knowingly, and feloniously exact, demand, and receive, *excessive prices therefor* from the retail grocers, merchants, and dealers in sugar in the state of Oklahoma, and other territories to the grand jurors unknown."

From the above quotations from the amendment of the act under which these prosecutions are instituted, and from the language employ-

ed by the pleader in the indictment, it is seen the charge as presented is in the exact language of the clause of section 4 of the act as amended. The question first presented by the demurrers to the several indictments, is this:

Conceding war to have actually or theoretically existed at the date this amendment took effect (October 22, 1919), and further conceding to Congress the fullest and most absolute plenary exercise of legislative power at the date this enactment took effect to provide for the safety of the nation and the maintenance of its armies then engaged in war, through the preservation and control of necessary and essential food products of the country, and further conceding the right of the Congress to create just such exceptions and exemptions from the operation of the act which are found written therein, the questions remain: Does an indictment charging, as these do, the defendants, in the language of the statute, state a public offense under the settled principles of the law of criminal pleading and practice in this country essential to be observed in any orderly enforcement of the laws of our land, and having a reasonably decent regard for the safety of the individual citizen against oppression, which is, or should be, the supreme law of our land? (2) If so, is it within the constitutional power of the Congress to carve out and create a new criminal offense in language so broad, comprehensive, indefinite, general and uncertain of meaning as is clause (e) of the amendment above quoted? If both of these questions be answered in the affirmative (and they will be considered together), it is obvious the indictments presented must be held impregnable to the challenge made by the demurrers; otherwise, not.

A glance at the language employed by the pleader in drafting the indictments is sufficient to show it was his thought the language employed by the Congress in the act is sufficiently definite and certain to charge the commission of a public offense, and this for the reason the language found in the charging part of the indictments is identical with that found in the act itself. Hence the question first presented is this: Conceding the constitutional validity of the act in creating in clause (e) a new criminal offense, if sufficient issuable facts be pleaded to bring the defendants within the prohibition of the act, yet is an indictment drawn under said clause in the language therein employed sufficiently definite and certain to state a public offense?

In the consideration of this question it must be borne in mind the charge here presented is one of criminal conspiracy to violate the provisions of said clause (e). If this criminal conspiracy be that created by the amendment itself, then it was entirely unnecessary for the pleader to set out the doing of the many overt acts in furtherance of the unlawful confederacy to make out a complete or punishable offense in these cases, for none such are required to be either pleaded or proven under the language of the act itself. Hence the acts alleged to have been done in furtherance of the conspiracy add nothing whatever to the charging portion of the indictment.

Again, if the conspiracy attempted to be charged in these cases is framed under the old conspiracy act (section 37 of the Penal Code

[Comp. St. § 10201]), while it is requisite in such case to plead and prove the doing of one or more overt acts by one or many of the co-conspirators after the formation of the conspiracy and in furtherance of its unlawful purpose to make out a completed and punishable offense, yet such overt acts charged to have been done cannot be resorted to, to explain or aid in any manner in making out the criminal charge of conspiracy. This is the settled law. In United States v. Britton, 108 U. S. 199, 2 Sup. Ct. 531, 27 L. Ed. 698, Mr. Justice Woods, delivering the opinion of the court, says:

"The provision of the statute, that there must be an act done to effect the object of the conspiracy, merely affords a locus penitentiæ, so that before the act done either one or all of the parties may abandon their design, and thus avoid the penalty prescribed by the statute. It follows as a rule of criminal pleading that, in an indictment for conspiracy under section 5440, the conspiracy must be sufficiently charged, and that it cannot be aided by the averments of acts done by one or more of the conspirators in furtherance of the object of the conspiracy. Reg. v. King, 7 Q. B. 782; Commonwealth v. Shedd, 7 Cush. 514."

In Pettibone v. United States, 148 U. S. 197, 13 Sup. Ct. 542, 37 L. Ed. 419, Mr. Chief Justice Fuller, delivering the opinion for the court, says:

"The conspiracy must be sufficiently charged, and cannot be aided by averments of acts done by one or more of the conspirators in furtherance of the object of the conspiracy."

In Dealy v. United States, 152 U. S. 539, 14 Sup. Ct. 680, 38 L. Ed. 545, Mr. Justice Brewer, delivering the opinion of the court, says:

"If the conspiracy was entered into within the limits of the United States and the jurisdiction of the court, the crime was then complete, and the subsequent overt act in pursuance thereof may have been done anywhere."

See, also, Bannon & Mulkey v. United States, 156 U. S. 464, 15 Sup. Ct. 467, 39 L. Ed. 494; Hyde v. Shine, 199 U. S. 62, 25 Sup. Ct. 760, 50 L. Ed. 90; Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, Ann. Cas. 1914A, 614.

Hence it is seen all that is here charged against defendants is a conspiracy to charge excessive prices for the necessary commodities by them sold. What constitutes this excessive price is nowhere defined, stated, or charged. What the market price of the necessary commodity was at the time is not stated or charged. What the true or intrinsic value of this necessary food product is, in comparison with other necessary food commodities, is not stated. In certain of the cases, at least, defendants are charged as wholesale merchants dealing or trading in this necessary food product at wholesale, in which event, to remain in such business, of necessity, they must continue to replace the stock of the commodity as exhausted by sales. Yet in no manner or way is such replacement cost or value stated. Indeed, the charging part of the indictments in these cases nowhere alleges the amount charged or the price at which defendants purchased the necessary food products; hence the only act charged against defendants in these cases is the bald, naked conclusion in the mind of the pleader that defendants conspired to charge a price (not stated) which the

grand jurors find or considered in their minds (no other standard of measure is given) to have been excessive?

True, the prices now charged and paid, and which have for some time prevailed, are unquestionably excessive as compared with those of former years. But the reason for this is not difficult to see nor hard to understand. Whether the prices charged by defendants, whatever they may have been, will, in future, be regarded as excessive, no man living can tell with certainty. In all probability the answer to this question depends more upon whether this country shall continue to feed warring Europe and our people at war in Europe, or whether our people shall again settle down to normal, natural, peaceful life of producing a sufficient food supply, than it does or will on acts of Congress or criminal prosecutions in our courts of justice.

What is an excessive price or a low price for any commodity, in all reason, is, and ever must continue to be, one of comparison only. "There is nothing either good or bad, but thinking makes it so." Being a matter capable of ascertainment only by comparison, and incapable of being judged by any fixed standard, and, in the end, controlled by the law of supply and demand, can it be possible for the law-making power, in the first instance, to create a criminal offense in such vague, indefinite, uncertain language as is that found in clause (e) of the amendment, above set forth; and, having done this, again, is it possible under the settled principles of criminal practice and procedure in the courts of justice of our country, guided by a written Constitution, to charge a citizen with the commission of a crime in the vague, indefinite, uncertain, general language of this enactment? I do not so believe, and if it be so held, now or in the future, by our courts, then our much-vaunted freedom of the individual citizen from oppression will become as unstable, uncertain, and untrustworthy as hieroglyphics written in mud.

In support of the validity and sufficiency of the charging part of the indictments it is by the government contended the word "excessive," employed, has a well-defined meaning among lexicographers and those speaking the English tongue. Grant this, but it proves nothing. The word "rascal" also has a dictionary definition; so do the words "villain" and "villainous." But who would have dreamed of contending, no matter what form the criminal act took, an indictment merely charging a citizen with being or acting as a villain or a villainous rascal would define or charge him with any possible criminal offense.

In other words, even though conceding the power of the Congress to make criminal the demanding, exacting, or receiving of excessive prices for necessary food products in the broad general language employed in clause (e) of the amendment, yet an indictment charging the commission of the substantive offense under such a statute, or an indictment charging a conspiracy to commit such substantive offense as in these cases, must allege, in addition to the language creating the offense such independent, issuable facts as, if proven, will convince the minds of the jurors trying the case the prices demanded and received by the defendants under the circumstances were excessive, and not leave the decision of this question to be determined by the beliefs

or conclusions of the jurors as to what is or is not excessive. In such cases as these, when the law-making power employs general terms only, or when the statute creates the offense in mere generic terms, or, still more closely allied to this case, where the charging part of the indictment contains a mere conclusion of the pleader, in all such cases a charge in the language of the statute is wholly insufficient to present any issuable public offense to the jury. This has always been the settled rule of criminal pleading in the courts of this country, as may be seen by reference to a few of the adjudicated cases controlling here. Thus, in the great case of United States v. Cruikshank et al., 92 U. S. 542, 23 L. Ed. 588, Mr. Chief Justice Waite, delivering the opinion of the court, in passing on this precise question, said:

"It is an elementary principle of criminal pleading that, where the definition of an offense, whether it be at common law or by statute, 'includes generic terms, it is not sufficient that the indictment shall charge the offense in the same generic terms as in the definition; but it must state the species, it must descend to particulars.' 1 Arch. Cr. Pr. and Pl. 291. The object of the indictment is, first, to furnish the accused with such a description of the charge against him as will enable him to make his defense, and avail himself of his conviction or acquittal for protection against a further prosecution for the same cause; and, second, to inform the court of the facts alleged, so that it may decide whether they are sufficient in law to support a conviction, if one should be had. For this, *facts are to be stated, not conclusions of law alone.* A crime is made up of acts and intent; and these must be set forth in the indictment, with reasonable particularity of time, place, and circumstances."

In United States v. Hess, 124 U. S. 483, 8 Sup. Ct. 571, 31 L. Ed. 516, Mr. Justice Field, delivering the opinion for the court, said:

"The statute upon which the indictment is founded only describes the general nature of the offense prohibited, and the indictment, in repeating its language without averments disclosing the particulars of the alleged offense, states no matters upon which issue could be formed for submission to a jury. The general, and with few exceptions, of which the present is not one, the universal, rule on this subject is that all the material facts and circumstances embraced in the definition of the offense must be stated, or the indictment will be defective. No essential element of the crime can be omitted, without destroying the whole pleading. The omission cannot be supplied by intendment, or implication, and the charge must be made directly, and not inferentially, or by way of recital. * * * The doctrine invoked by the solicitor general, that it is sufficient, in an indictment upon a statute, to set forth the offense in the words of the statute, does not meet the difficulty here. Undoubtedly the language of the statute may be used in the general description of an offense, but it must be accompanied with such a statement of the facts and circumstances as will inform the accused of the specific offense, coming under the general description, with which he is charged. One or two cases will serve as an illustration of the doctrine."

In United States v. Simmons, 96 U. S. 360, 24 L. Ed. 819, Mr. Justice Harlan, delivering the opinion for the court, returned answer to the following specific question:

"Whether it is sufficient, in an indictment drawn under that portion of the section which prohibits the use of a still, boiler, or other vessel, for the purpose of distilling, in any building or on premises where vinegar is manufactured or produced, to charge the offense in the words of the statute."

The answer is as follows:

"Where the offense is purely statutory, having no relation to the common law, it is, 'as a general rule, sufficient in the indictment to charge the defendant with acts coming fully within the statutory description, in the substantial words of the statute, without any further expansion of the matter.' 1 Bishop, Crim. Proc. § 611, and authorities there cited. But to this general rule there is the qualification, fundamental in the law of criminal procedure, that the accused must be apprised by the indictment, with reasonable certainty, of the nature of the accusation against him, to the end that he may prepare his defense, and plead the judgment as a bar to any subsequent prosecution for the same offense. An indictment not so framed is defective, although it may follow the language of the statute."

Sherwood, Justice, delivering the opinion of the court, in State v. Meysenburg, 171 Mo. 1, 71 S. W. 229, quoting from Bishop's New Criminal Procedure, § 331, said:

"The facts in allegation must be the primary and individualizing ones. Thus a charge that the defendant committed larceny discloses only a secondary fact, produced by a combination of primary facts and law; in other words, it is a conclusion of the law. This does not suffice. The pleader should set out the primary facts, disconnected from the law; then the court, knowing the law and applying it to them, will deduce the legal result."

Elsewhere the same author observed:

"A statute having made it punishable for one not a qualified voter to vote at an election, a charge of the offense simply in these words was adjudged inadequate; for whether or not the defendant is such voter is a deduction of the law from the facts, and, though a statute may define an offense by its legal result, not so an indictment. It must state the facts whence the result comes, thus notifying the defendant of what he must meet, and putting upon the record a proper case for the court's adjudication."

See, also, on this head, State v. Graham, 38 Ark. 519.

In the light of the cases cited, controlling here, which might be indefinitely multiplied, it must be held, even considering the amendment under which the indictments in these cases are drawn to be within the constitutional power of Congress, that an indictment in the language of the statute presents no issuable fact to be tried and determined by the jury; hence is insufficient. The principal reliance of the government as against the demurrers based on this ground is the case of Nash v. United States, 229 U. S. 373, 33 Sup. Ct. 780, 57 L. Ed. 1232, in which was considered the sufficiency of an indictment drawn under the provisions of the Sherman Anti-Trust Act (Comp. St. §§ 8820–8823, 8827–8830). While it is true some language found in the opinion in this case, prepared by Mr. Justice Holmes, might seem to support the contention made by the government in these cases, yet that case dealt with such terms as "restraint of trade," "monopoly," etc., which terms have a well-settled meaning at the common law. Hence, while what is said may be applicable to the indictment returned in that case, yet it would be misleading and dangerous in the extreme, and subversive of the fundamental principles in criminal pleading, to extend some of the language employed in that opinion to such a case as these, dealing with the term "excessive price," which has no settled, legal definition or significance, but only one given to it by lexicographers.

Many decisions and statements emanating from other courts in pass-

ing upon different parts of section 4 as amended have been employed in argument in these cases, some inclined to support and other some to deny the constitutional validity of the several parts of the amended act. I do not find it necessary in these cases at this time to rule the question of constitutional validity raised. Even if that be conceded, the indictments are fatally defective for want of sufficient averment of issuable facts.

It follows, both in the very reason of the case itself and on fundamental principles of criminal pleading, as deduced from the well-considered opinions of powerful jurists speaking for the highest court of the land, the indictments in these cases present no issuable facts to be tried and determined by a jury touching the guilt or innocence of the defendants, but mere conclusions of the pleader; hence they are insufficient, and the several demurrers thereto must be and are sustained.

It is so ordered.